**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

```
--------------------------------------------------------x
```
MAYOR RAS BARAKA *in his official*      : Civil Action No.: 2:25-cv-06846-BRM-JBC
*and personal capacities*,              :
                    Plaintiff,          :
                                        :
                                        :
v.                                      :
                                        :
ALINA HABBA and                         :   **AMENDED COMPLAINT AND**
RICKY J. PATEL, *in their personal and* :   **JURY DEMAND**
*official capacities*,                  :
                    Defendants.         :
```
--------------------------------------------------------x
```

Plaintiff, Newark, New Jersey Mayor Ras Baraka ("Plaintiff"), residing in Newark, New

Jersey, alleges the following:

## **NATURE OF THE CASE**

1.      Plaintiff brings this action seeking damages and to remedy Defendants' subjecting

him to false arrest and malicious prosecution in violation of his Constitutional rights under the

Fourth Amendment.  Plaintiff also brings an action for defamation and false light against

Defendant Habba.

## **THE PARTIES**

2.      Plaintiff, Mayor Ras Baraka, a citizen and resident of New Jersey, is the duly

elected Democratic Mayor of Newark, New Jersey.

3.      Defendant, Alina Habba, a resident of New Jersey, at all times relevant to this

Complaint was the interim United States Attorney for the District of New Jersey, but in this

matter acted as a political operative, outside of any function intimately related to the judicial

process and/or in the abuse of the office.

1

4.         Defendant, Ricky J. Patel, at all times relevant to this Complaint, was working in New Jersey as the Special Agent in Charge of the Newark Division of Homeland Security Investigations, in the Department of Homeland Security ("DHS").

**JURISDICTION AND VENUE**

5.         Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331,  which provides this Court with original jurisdiction over these claims that Defendants Habba and Patel violated Plaintiff Baraka's Constitutional rights, specifically his rights guaranteed by the Fourth Amendment, pursuant to Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971). This Court has supplemental jurisdiction over the State law claims under 28 U.S.C. § 1367.

6.         Venue is proper in the United States District Court for the District of New Jersey because the events giving rise to the claims occurred in this district.  28 U.S.C. § 1391(b)(2).

**FACTS RELEVANT TO ALL DEFENDANTS**

7.         As the duly elected Mayor of Newark, New Jersey, Plaintiff Mayor Baraka has an obligation to promote the health and safety of all residents.  Mayor Baraka and Newark fire, health, zoning, and building inspectors have repeatedly been thwarted in their efforts to enforce the laws of the City of Newark at Delaney Hall.

8.         The GEO Group ("GEO"), a private prison company, owns and operates Delaney Hall.  GEO contracted with DHS to operate a U.S. Immigration and Customs ("ICE") detention facility, GEO, DHS and ICE have repeatedly denied access to Newark officials seeking to conduct necessary and legally required inspections.

9.         Exercising his rights under the First Amendment to the U.S. Constitution, Mayor Ras Baraka, a Democrat, made many public statements expressing his view that the Fifth

2

Amendment to the U.S. Constitution guarantees all persons, including immigrants, the right to due process and has vocally opposed the abuse and mistreatment of immigrants by the Trump administration, as well as the controversial reopening of Delaney Hall following its closure.

10.     Mayor Baraka was alarmed when the GEO Group allowed DHS to house detainees in a building without the required inspections or a Certificate of Occupancy required by the City of Newark. Mayor Baraka continually sought to ensure the safety and health of residents in his City as part of his duty as Mayor.

11.     Defendant Habba has made her biased political goals explicit.  Days before being sworn in as the interim U.S. Attorney for the District of New Jersey, Habba attacked Democratic United States Senator Cory Booker and Democratic Governor Phil Murphy claiming that they *"have failed the State of New Jersey."*

12.     On March 28, 2025, the day she was sworn in as interim U.S. Attorney, Defendant Habba announced her plan to use the power of the office of the United States Attorney to help one party, Republicans, which is led by her former client, Donald Trump: *"We could turn New Jersey red . . . Hopefully, while I'm there [in office], I can help that cause."* These goals are antithetical to her role and ethical obligations as a U.S. Attorney.

13.     Days after being sworn in, Habba announced on Fox News that she would be "investigating" New Jersey's Democratic Governor and his appointed Attorney General, claiming New Jersey's lawful Immigrant Trust Directive is thwarting Trump's immigration policies.  Habba claimed that New Jersey's Governor and Attorney General were interfering with her effort to take "all criminals out of the country" – apparently except for her former client, convicted felon Donald Trump.

3

14.        On May 9, 2025, three members of the United States House of Representatives, Bonnie Watson Coleman, Rob Menendez, and LaMonica McIver arrived at Delaney Hall for an inspection of the facility.  Members of Congress have an absolute legal right to inspect all DHS facilities pursuant to the Consolidated Appropriations Act, 2020, Division D - Department of Homeland Security Appropriations Act, 2020, §532.  Congress has re-affirmed that authority every year since 2020, including in § 527(a) of the appropriations bill in 2024.

15.        Congresswoman McIver invited Mayor Baraka to meet her and her colleagues for a press conference after the inspection, outside Delaney Hall, on public Newark property.

16.        Numerous media companies and private individuals were outside Delaney Hall on May 9, 2025, many of whom witnessed and recorded the events as set forth herein.

17.        On the afternoon of May 9, 2025, Representatives Watson Coleman, Menendez and McIver arrived at Delaney Hall. They were escorted inside the gate of Delaney Hall but were kept waiting for more than an hour in a waiting area inside the building.

18.        At 1:42 PM, Mayor Baraka arrived at Delaney Hall and spoke to some members of the public outside the gate.

19.        At 1:46 PM, many of the members of the public gathered outside the fence and gate began chanting that the Mayor should be allowed to join the members of Congress.

20.        At 1:50 PM, the GEO Group guard at the gate invited Mayor Baraka to enter inside the fence of Delaney Hall stating that it would "calm the crowd."  The GEO Group guard opened the gate to invite Mayor Baraka inside onto the privately owned and operated property. Mayor Baraka stepped inside the gates.

21.        From 1:50 PM to 2:33 PM, Mayor Baraka calmly waited just a few feet inside the fence surrounding Delaney Hall.

22.      At 2:33 PM, Defendant Patel, who does not represent the owner of the property, approached Mayor Baraka and told him to leave the property owned and operated by the GEO Group, even though an agent of GEO invited Mayor Baraka onto the property. During the discussion that followed, Mayor Baraka advised Defendant Patel that he was invited onto the property. Without any inquiry or evidence, Defendant Patel disputed that.

23.      While Defendant Patel and Mayor Baraka were speaking, at approximately 2:36 PM, the members of Congress saw Mayor Baraka through the windows in the building and walked toward the gate to speak to him.

24.      From 2:36 to 2:38, the members of Congress spoke to Defendant Patel stating that they had been waiting for over an hour for their inspection, and expressed their desire that the Mayor join them. After the members of Congress conveyed their thoughts, Defendant Patel threatened to arrest the Mayor.  In response, the Mayor said: "I'm leaving now."  Patel responded: "Okay, go." The Mayor and Congresswoman Watson Coleman immediately walked to the gate together at 2:38 PM.

25.      While standing near the gate, an aide to Congresswoman Watson Coleman attempted to pass the Congresswoman a cell phone.  When it fell to the ground, Mayor Baraka helped her retrieve it.

26.      After Mayor Baraka assisted the Congresswoman retrieve her cell phone, at 2:39 PM, the GEO guard opened the gate, and Mayor Baraka complied with Defendant Patel's order to leave the GEO Group property and Congresswoman Watson Coleman joined her Congressional colleagues.

27.    The members of Congress went toward the holding room when they saw DHS agents on the telephone, overheard the plan to arrest the Mayor, and saw many DHS agents approaching the gate toward Mayor Baraka.

28.    The members of Congress walked with the DHS agents through the open gate to join the Mayor outside Delaney Hall on the Newark public property.

29.    At 2:44 PM, five minutes after Mayor Baraka left the GEO Group property, approximately 20 DHS agents, many armed and masked, descended on the Mayor and members of Congress without any attempt to calm fears or ensure peace.

30.    Egged on by Defendant Patel, who ordered the DHS agents to "take him down" (meaning violently tackle the Mayor of Newark), the agents pushed, shoved and assaulted the Mayor's security team and members of Congress before violently pulling Mayor Baraka's arms and arresting him *without probable cause*.

31.    The DHS agents handcuffed the Mayor behind his back in an effort to effect maximum humiliation for what Defendant Habba's office later admitted was an alleged "petty offense."

32.    At 3:07 PM, DHS representatives left Delaney Hall by car with Mayor Baraka and brought him to another DHS facility where he was subjected to being photographed for a mug shot and fingerprinted.

33.    The DHS agents interviewed Mayor Baraka for approximately thirty (30) minutes during which he explained that he was invited onto the GEO Group property by a GEO Group employee and that he left the property when ordered to do so.

34.    At 3:05 PM, *before Mayor Baraka had been transported from Delaney Hall*, hours before the U.S. Attorney had filed a complaint, and before the Mayor had been

6

fingerprinted and photographed, Defendant Habba, issued a false and defamatory statement on her *personal* social media account:



35.         Defendant Habba issued the defamatory statement and authorized the false arrest of Mayor Baraka despite having knowledge of clear evidence that Mayor Baraka had not committed the petty offense of "defiant trespass."  In authorizing and/or directing the arrest of Mayor Baraka without proper legal grounds, Defendant Habba was acting for political reasons and fulfilling her stated goal of *"turning New Jersey red"* by instigating and/or authorizing the false arrest of Mayor Baraka, a Democrat.

36.         Later on May 9, 2025, Defendant Habba participated in a telephone interview with Fox News during which she continued to make false and defamatory statements, including, but not limited to:

A.   *"He [Mayor Baraka] refused to leave, was put under arrest inside the facility, walked out when he was told he was under arrest, and then was cuffed"*;

B.   *"The Mayor was inside and told he would be under arrest inside when he refused to leave after several notifications that he should remove himself. He chose not to do so and then was placed under arrest when he walked out of the facility"*; and

C.   *"It's called grandstanding, unfortunately. When you break the law, there's no grandstanding that will help you."*

37.   At the time Defendant Habba published the above statements, she was aware that Mayor Baraka had not committed trespass, had not refused to leave the ICE detention center in Newark, did not ignore multiple warnings to leave the facility, and had not "willingly chosen to disregard the law." Thus, these statements are knowingly false.

38.   In the alternative, Defendant Habba had sufficient information within her possession that the statements made in her social media post were made with serious doubts about the truth of her statements, and/or she deliberately ignored facts (as set forth herein) that would have revealed their falsity. In addition, Defendant Habba's statements and actions made it clear that she did not care about the truth of the statements.

39.   Following the events of May 9, 2025, Defendants Habba and Patel conspired with and/or directed DHS officials in promoting a false and defamatory narrative about the events on May 9, 2025. For example, on May 10, 2025, the Assistant Secretary for Public Affairs at DHS, Tricia McLaughlin, appeared on CNN and made the following false and defamatory statements:

A.   "The members of Congress and the Mayor and a mob of protestors stormed the gate [at Delaney Hall]";

B.   "This is a guy [Mayor Baraka] storming an ICE facility, he's putting detainees at risk, putting law enforcement at risk; he's joined by a mob of people who want to end ICE; this is nothing more than political games and we're not playing";

C.   "[The Mayor] broke into a detention facility";

8

D.      "There were multiple people arrested";

E.      "A bus of detainees was at the gate";

F.      "It is flat out false that there are code violations"; and

G.      "There were proper inspections and permits."

40.      Defendants Habba and Patel conspired, with others, to abuse their offices and effectuate the arrest premised upon a knowingly false Affidavit stating that "Ras Baraka, did, knowing that he was not licensed or privileged to do so, enter and remain in a place as to which notice against trespass was given. In violation of Title 18, United States Code, Section 13 and N.J.S.A. 2C:18-3."  The Affidavit further details that the Mayor "unlawfully entered and remained in the Delaney Hall Facility." Criminal Complaint, United States v. Baraka, No. 2:25-mj-11131-AME (D.N.J. May 9, 2025).  In fact, Mayor Baraka was invited onto the property by an agent of the private company that owns the property and was instructed by that agent to remain there for approximately forty-five minutes until he voluntarily and peacefully exited the private property.

41.      Additionally, Mayor Baraka left Delaney Hall when ordered to do so by someone who was not a representative of the owner of the property.  Neither element of trespass is met in this case.

42.      The false Affidavit was made with malice, particularly seeking to assure that the evening news included videos of the Black Mayor of Newark, New Jersey being led away in handcuffs by federal officials.

43.      Defendants kept Mayor Baraka in federal custody for over five hours.  Ordinarily, federal law enforcement officials issue a summons for the petty offense of trespassing.  Usually,

the alleged trespasser is not arrested or imprisoned for hours before his presentation before a judge.

44.     DHS, under Defendant Patel's direction, unnecessarily increased Mayor Baraka's time in custody by delaying the submission of a charging document to the court for nearly five hours.

45.     Hours after his arrest, at approximately 7 PM on the evening of May 9, 2025, Mayor Baraka had his initial appearance in federal court virtually from DHS headquarters, during which Defendant Patel sat next to him.

46.     On May 12, 2025, Mayor Baraka was subjected to a pre-trial services interview which invaded his privacy with extremely intrusive and demeaning questions about his personal life and personal history.

47.     On May 15, 2025, Mayor Baraka attended a Status Conference before the Honorable André M. Espinosa, United States Magistrate Judge. Defendant Habba also attended the conference.

48.     As part of the demeaning process instigated by Defendants, although Mayor Baraka had already been photographed and fingerprinted by DHS, U.S. Marshals took the Mayor to the basement of the federal courthouse and subjected him to further humiliation by taking his photograph and fingerprints again.

49.     After video became public showing that Defendants Habba and Patel had lied, falsely arrested, and maliciously prosecuted Mayor Baraka, Defendant Habba threatened the Mayor with more false charges, claiming that she would charge him with resisting arrest if he did not agree to give up his right to sue for attorneys' fees.  He refused.

10

50.    On May 19, 2025, ten days after Mayor Baraka's arrest, Defendant Habba moved to dismiss the charge against him.

51.    In granting the motion on May 21, 2025, Judge Espinosa admonished the Office of the United States Attorney for its handling of the matter:

> Your office serves the 9.5 million people who live in the District of New Jersey, and your colleagues are charged with working to protect those people and the interests of the Constitution under which we all live and that you and every one of your colleagues swore to uphold when you joined that Office. This is an immense responsibility with which comes an imperative for meticulous diligence and unwavering integrity.
>
> Almost a hundred years ago the Supreme Court articulated with decisive clarity the unique role of a prosecutor. Writing for the majority in Berger v. United States, Justice George Sutherland stated, 'The United States attorney is a representative not of an ordinary party to a controversy but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all and whose interests, therefore, in a criminal prosecution is not that it shall win a case but that justice shall be done.'
>
> Indeed, Mr. Demanovich, beyond those 9.5 million constituents and above any individual or agency interests, federal prosecutors serve a singular paramount client: Justice itself.
>
> Your role is not to secure convictions at all costs, nor to satisfy public clamor, nor to advance political agendas.
>
> Your allegiance is to the impartial application of the law, to the pursuit of truth, and to upholding of due process for all.
>
> In his seminal 1940 address, the federal prosecutor, then Attorney General Robert H. Jackson, articulated a truth that remains as vital today as it was 85 years ago. He cautioned against the temptation to prosecute every conceivable offense, reminding prosecutors that 'the citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes.'

11

Justice Jackson profoundly understood that the prosecutor's duty extends beyond simply securing convictions. It encompasses an obligation to select cases with the utmost care, to ensure that the facts truly warrant the profound disruption that a federal charge brings to an individual's life. Justice Jackson warned against using the immense power of the government to pursue weak cases or to make examples without sufficient cause.

Your discretion, therefore, is not merely a legal tool but a moral compass guiding the exercise of immense power. It demands a judicious restraint, a deep respect for individual liberty, and an unwavering commitment to the principle that justice is never served by arbitrary or ill-conceived actions.

*The hasty arrest of Newark Mayor Ras Baraka, followed swiftly by the dismissal of these trespassing charges a mere 13 days later, suggests a worrisome misstep by your Office. An arrest, particularly of a public figure, is not a preliminary investigative tool. It is a severe action, carrying significant reputational and personal consequences, and it should only be undertaken after a thorough, dispassionate evaluation of credible evidence.*

It's precisely that commitment to rigorous investigation and thoughtful prosecution that has characterized the distinguished history of your Office, Mr. Demanovich, particularly over the last two decades. The bench and the bar have witnessed in that period, the diligence and care demonstrated by prior U.S. attorneys in New Jersey, whose leadership has consistently upheld the highest standards of prosecutorial ethics and professionalism. Their legacy is one of careful deliberate action where charges were brought only after exhaustive evidence-gathering and a thorough consideration of all facts. That bedrock principle, consistently honored by your predecessors, is the foundation upon which the credibility and effectiveness of your Office rests.

So let this incident serve as an inflection point and a reminder to uphold your solemn oath to the people of this District and to your client, Justice itself, and ensure that every charge brought is the product of rigorous investigation and earned confidence in its merit, mirroring the exemplary conduct that has long defined your Office.

*The apparent rush in this case, culminating today in the embarrassing retraction of charges, suggests a failure to*

12

> *adequately investigate, to carefully gather facts, and to thoughtfully consider the implications of your actions before wielding your immense power. Your Office must operate with a higher standard than that.*
>
> U.S. v. Ras Baraka, 25-mj-11131 (USDNJ) (May 21, 2025 Transcript of Motion to Dismiss before the Honorable Andre M. Espinosa, USMJ) (emphasis added).

## COUNT ONE

**Bivens Claim for Violation of Fourth Amendment Rights (False Arrest) Against Defendants Alina Habba and Ricky Patel, in their Individual and Official Capacities**

52.     Plaintiff repeats and incorporates by reference all preceding paragraphs of the Complaint as though they were set forth herein at length.

53.     Plaintiff asserts a claim under Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), seeking money damages for the violation of his Fourth Amendment right to be free from unreasonable seizures.

54.     The Fourth Amendment to the United States Constitution provides that: "The right of people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." False arrest is an unconstitutional seizure.

55.     On May 9, 2025, Mayor Baraka was falsely arrested without probable cause while peacefully complying with law enforcement orders and after having been invited on private property by an authorized representative of the owner and operator of that property.

56.     The petty state crime of defiant trespass requires that the accused refuses to leave after being asked to do so. Mayor Baraka did leave after being asked to do so, although he was

13

invited on private property by an agent of the actual owner of the private property, and ordered to leave by a person who did not represent the owner of the private property.

57.    Defendant Patel, apparently in consultation with Habba and others, ordered the arrest despite clear evidence of Plaintiff's compliance and the absence of any criminal conduct.

58.    Defendant Habba, acting outside of any legitimate prosecutorial function and in concert with DHS agents, directed and ratified the unlawful arrest, later broadcasting defamatory and prejudicial statements to the public even before Mayor Baraka had been booked or charged.

59.    These actions constitute an unreasonable seizure under the Fourth Amendment. The facts presented fall squarely within the established core of Bivens-recognized Fourth Amendment claims. While the United States Supreme Court has recently emphasized caution in extending Bivens to new contexts, or where "special factors" counsel hesitation, this case does not require an extension; any differences in context are minor and no "special factors" justify immunizing such plainly unlawful conduct.

60.    Defendant Habba was not serving in a legitimate prosecutorial function when she acted with DHS agents in the scheme to arrest Mayor Baraka at Delaney Hall on May 9, 2025. There was no functional tie to the judicial process when Habba communicated with DHS agents and directed their actions at the site of the alleged crime and/or gave legal advice. "Prosecutors are not entitled to absolute immunity in giving legal advice to the police." Buckley v. Fitzsimmons, 509 U.S. 259 (1993). Seeking to generate evidence in support of an arrest and prosecution is an investigator's work and does not confer immunity on Defendant Habba.

61.    As a result of this false arrest, Plaintiff suffered severe reputational harm, emotional distress and other damages.

14

## COUNT TWO

**Bivens Claim for Violation of Fourth Amendment Rights (Malicious Prosecution)
Against Defendants Alina Habba and Ricky Patel
Individual and Official Capacities**

62.        Plaintiff repeats and incorporates by reference all preceding paragraphs of the Complaint as though they were set forth herein at length.

63.        Mayor Baraka asserts a Bivens claim for malicious prosecution in violation of the Fourth Amendment. Defendants initiated a criminal prosecution against Plaintiff without probable cause and with malice.

64.        The prosecution was predicated on demonstrably false assertions that Plaintiff had unlawfully trespassed, despite clear evidence to the contrary, including video footage and eyewitness accounts.

65.        Defendant Patel was on site and was told that Mayor Baraka was invited on the property owned and operated by the private prison company, and by an agent of that company. Defendant Patel also knew that Mayor Baraka exited the property when told to do so by Patel, who did not represent an owner of the property. Yet Defendant Patel knowingly submitted a false affidavit in support of the charges.

66.        Defendant Habba, acting outside the bounds of prosecutorial immunity, participated in the investigation and orchestration of the prosecution and publicly endorsed it for political purposes before judicial process had commenced.

67.        The malicious prosecution which led to the unjustified detention of the Mayor of Newark for over five hours, including fingerprinting, mug shots, invasive questioning, and repeated public humiliation, was in violation of the Fourth Amendment.

15

68.	The government was forced to dismiss the charge 13 days later.

69.	The Fourth Amendment protects against pretrial deprivations of liberty without probable cause. The malicious prosecution of Mayor Baraka resulted in an unlawful seizure and detention. Courts have consistently recognized Bivens claims in this context. Any distinction from traditional Bivens Fourth Amendment claims are immaterial, and no "special factors" weigh against allowing redress for this abuse of federal power.

70.	As a result of this malicious prosecution, Plaintiff suffered severe reputational harm, emotional distress and other damages.

**COUNT THREE**

**State Law Claim for Defamation Against Defendant Alina Habba,
in Her Individual Capacity**

71.	Plaintiff repeats and incorporates by reference all preceding paragraphs of the Complaint as though they were set forth herein at length.

72.	Defendant Habba, acting in her personal capacity, and outside the scope of any protected prosecutorial function, made false and defamatory statements about Plaintiff on social media and on television shortly after the arrest. These statements falsely accused Mayor Baraka of criminal conduct and misconduct, despite Habba's actual knowledge and reckless disregard of facts demonstrating his innocence, and in furtherance of her personal political motives.

73.	Defendant Habba's false accusations of criminal activity against Mayor Baraka are defamation *per se.*

74.	Defendant Habba's defamation was broadly repeated, including in the media and by DHS representatives.

16

75.     Defendant Habba made these knowingly false statements with actual malice and/or a reckless disregard for the truth, and intended them to harm Mayor Baraka's reputation, damage him politically, and serve Defendant Habba's personal and political interests.

76.     Defendant Habba's defamatory statements caused Mayor Baraka reputational damage, emotional distress, and other personal and professional harm.

## COUNT FOUR

### State Law Claim for False Light Against Defendant Alina Habba, in Her Individual Capacity

77.     Plaintiff repeats and incorporates by reference all preceding paragraphs of the Complaint as though they were set forth herein at length.

78.     Defendant Habba, acting in her personal capacity, and outside the scope of any protected prosecutorial function, made false and defamatory statements about Mayor Baraka on social media and on television shortly after the arrest. These statements falsely accused Mayor Baraka of criminal conduct and misconduct, despite Defendant Habba's actual knowledge and/or reckless disregard of facts demonstrating Mayor Baraka's innocence, and in furtherance of her personal political motives.

79.     Defendant Habba's false accusations of criminal activity against Mayor Baraka placed him in a false light that was highly offensive to a reasonable person.

80.     Defendant Habba made these knowingly false statements with actual malice and/or reckless disregard for the truth and intended them to cause harm to Mayor Baraka's reputation, damage him politically, and serve Defendant Habba's personal and political interests.

17

81.    Defendant Habba's portrayal of Mayor Baraka in a false light caused Mayor Baraka emotional distress, and other personal and professional harm.

WHEREFORE, cause having been shown, Plaintiff, Mayor Ras Baraka, demands judgment in his favor and against Defendants and seeks the following relief:

(a)    Compensatory damages for pain, suffering, stress, humiliation, mental anguish, emotional harm and personal physical injury and physical sickness, as well as damage to his reputation;

(b)    Punitive damages;

(c)    Attorneys' fees, including but not limited to pursuant to the N.J. Civil Rights Act to the extent applicable, pre-and post-judgment interest, reimbursement for the negative tax consequences of a judgment and costs of suit, and restitution for all costs stemming from defense and affirmative prosecution of harm suffered; and

(d)    Such other relief as the Court may deem equitable and just.

**BROMBERG LAW LLC**
Yael Bromberg, Esq.
43 West 43rd Street, Suite 32
New York, NY 10036-7424
(212) 859-5083

BY:    _____

YAEL BROMBERG, ESQ.

Dated: 5/8/2026