# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MAYOR RAS BARAKA *in his official and personal capacities*,<br><br>    Plaintiff,<br><br>  v.<br><br>ALINA HABBA and<br>RICKY J. PATEL, *in their personal and official capacities*,<br><br>    Defendants. | Hon. Brian R. Martinotti, U.S.D.J.<br><br>Civil Action No. 2:25-cv-06846 |

# PLAINTIFF'S BRIEF IN OPPOSITION OF DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) and 12(b)(6)

**BROMBERG LAW LLC**
Yael Bromberg, Esq.
43 West 43rd Street, Suite 32
New York, NY 10036-7424
212-859-5083

*Attorney for Plaintiff*

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT.......................................................... 1

II.   STATEMENT OF FACTS ................................................................. 2

III.  STANDARD OF REVIEW ............................................................... 7

IV.  LEGAL ARGUMENT ..................................................................... 8

1.  The complaint states common law claims against Habba in her personal capacity, and the Court has subject matter jurisdiction to resolve the question of whether she was operating within or outside her scope of employment. Discovery is both necessary and standard to resolve the question. .................................................... 8

    A. The Second Restatement of Agency applies in New Jersey and directs a fact-bound inquiry. ..................................... 10

    B. The complaint presents a live controversy for which relief is plausible................................................................. 13

2.  The complaint states Fourth Amendment claims under *Bivens*.... 25

    A. *Bivens* remains precedent in the search and seizure context......................................................... 26

    B. The Fourth Amendment false arrest claim here arises in the established *Bivens* context............................................. 32

    C. The Fourth Amendment malicious prosecution claim does not arise in a new *Bivens* context................................... 38

    D. "Special Factors" do not foreclose *Bivens* relief here....... 39

3.  The Defendants are not entitled to Qualified Immunity for the *Bivens* claims, because there was no probable cause to initiate the

arrest, and because they violated a clearly established constitutional right. ................................................................. 42

4. Habba is not entitled to Absolute Immunity ................................ 48

5. The City of Newark ................................................................ 49

V.    CONCLUSION ........................................................................ 50

**TABLE OF AUTHORITIES**

**Cases**

Adams v. United States,
  319 U.S. 312 (1943) ................................................................................... 21
Anderson v. Creighton,
  483 U.S. 635 (1987) ...............................................................................25, 43
Andrews v. Scuilli,
  853 F.3d 690 (3d Cir. 2017) ...................................................................... 43
Arias v. Herzon,
  150 F.4th 27 (1st Cir. 2025) ...............................................................passim
Ashcroft v. al-Kidd,
  563 U.S. 731 (2011) ................................................................................... 43
Ashcroft v. Iqbal,
  556 U.S. 662 (2009) ..................................................................................... 7
Barry v. Anderson,
  No. 22-3098, 2023 WL 8449246 (3rd Cir. Dec. 6, 2023) ........................... 34
Bell Atl. Corp. v. Twombly,
  550 U.S. 544 (2007) ..................................................................................... 7
Berger v. United States,
  295 U.S. 78 (1935) ..................................................................................... 14
Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics,
  409 F.2d 718 (2d Cir. 1969), *rev'd*, 403 U.S. 388 (1971) ........................... 39
Bivens v. Six Unknown Named Agents,
  403 U.S. 388 (1971) ...........................................................................passim
Blassingame v. Trump,
  87 F.4th 1, 463 U.S. App. D.C. 442 (D.C. Cir. 2023) ................................. 23
Bowles v. United States,
  685 F. App'x 21 (2d Cir. 2017) .................................................................. 10
Buckley v. Fitzsimmons,
  509 U.S. 259 (1993) ................................................................................... 48
Bush v. Lucas,
  462 U.S. 367 (1983) ................................................................................... 40

iii

Carlson v. Green,
  446 U.S. 14 (1980) ................................................................................passim
Carroll v. Trump,
  498 F. Supp. 3d 422 (S.D.N.Y. 2020) ........................................................ 23
Carroll v. Trump,
  49 F.4th 759 (2d Cir. 2022) ................................................................10, 23
Carter v. Reynolds,
  175 N.J. 402 (2003) ............................................................................10, 11
CNA v. United States,
  535 F.3d 132 (3d Cir. 2008) *as amended* (Sept. 29, 2008) .......................... 10
Corr. Servs. Corp. v. Malesko,
  534 U.S. 61 (2001) ................................................................................ 27
Davis v. Passman,
  442 U.S. 228 (1977) ...............................................................26, 28, 29, 37
Dempsey v. Bucknell Univ.,
  834 F.3d 457 (3d Cir. 2016) ..................................................................... 46
Edwards v. Gizi,
  107 F.4th 81 (2d Cir. 2024) ................................................................29, 34
Egbert v. Boule,
  596 U.S. 482 (2022) ..........................................................................passim
Evans v. Newark City,
  152 F.4th 537 (3d Cir. 2025) .................................................................... 43
Farah v. Weyker,
  926 F.3d 492 (8th Cir. 2019) .................................................................... 39
Fisher v. Hollingsworth,
  115 F.3d 197 (3d Cir. 2024) ..................................................................... 29
Fogle v. Sokol,
  957 F.3d 148 (3d Cir. 2020) ..................................................................... 48
Frisbie v. Collins,
  342 U.S. 519 (1952) ............................................................................... 41
Garcia v. United States,
  88 F.3d 318 (5th Cir. 1996) ...................................................................... 10
Gallo v. City of Philadelphia,
  161 F.3d 217 (3d Cir. 1998) ................................................................39, 43

iv

Goldey v. Fields,
  606 U.S. 942 (2025) .................................................................................. 26

Gould Electronics Inc. v. United States,
  220 F.3d 169 (3d Cir. 2000).................................................................... 7, 18

Greenpoint Tactical Income Fund LLC v. Pettigrew,
  38 F.4th 555 (7th Cir. 2022)........................................................................ 27

Gutierrez de Martinez v. Lamagno,
  515 U.S. 417 (1995) ...................................................................................... 9

Hafer v. Melo,
  502 U.S. 21 (1991) ...................................................................................... 10

Hartman v. Moore,
  526 U.S. 250 (2006) .................................................................................... 26

Harvard v. Cesnalis,
  973 F.3d 190 (3d Cir. 2020).................................................................... 42

Henry v. Essex County,
  113 F.4th 355 (3rd Cir. 2024)................................................................36, 42

Hernández v. Mesa,
  589 U.S. 93 (2020) ...................................................................................... 26

Hicks v. Ferreyra,
  64 F.4th 156 (4th Cir. 2023) cert. denied, 144 S. Ct. 555 (2024) ...........passim

Imbler v. Pachtman,
  424 U.S. 409 (1974) .................................................................................... 48

Kalu v. Spaulding,
  113 F.3d 311 (3rd Cir. 2024)................................................................37, 39

Kentucky v. Graham,
  473 U.S. 159 (1985)................................................................................49, 50

Lee v. Trump,
  No. 21-cv-400, 2026 U.S. Dist. LEXIS 69924,
  2026 WL 880161 (D.D.C. Mar. 31, 2026).......................................22, 23, 24

Matsko v. United States,
  372 F.3d 556 (2004) ..........................................................................11, 14, 15

McMullen v. Maple Shade Twp.,
  643 F.3d 96 (3d Cir. 2011)............................................................................ 8

v

Melo v. Hafer,
   912 F.2d 628 (3d Cir. 1990).................................................................... 10

Muniz v. United States,
   149 F.4th 256 (3rd Cir. 2025) ................................................................ 37

Napue v. People of State of Ill.,
   360 U.S. 264 (1959) ............................................................................... 47

Odd v. Malone,
   538 F.3d 202 (3rd Cir. 2008) ...........................................................36, 48

Oliva v. Nivar,
   973 F.3d 438 (5th Cir. 2020).................................................................. 31

Osborn v. Haley,
   549 U.S. 225 (2007) ................................................................................. 9

Pinkney v. Meadville, PA,
   95 F.4th 743 (3d Cir. 2024)................................................................... 42

Roberts v. Lau,
   90 F.4th 618 (3d Cir. 2024).................................................................... 48

Schweicker v. Chilicky,
   487 U.S. 412 (1988) ............................................................................... 40

Sherwood v. Mulvihill,
   113 F.3d 396 (3d Cir. 1997) ................................................................... 46

Siemens Bldg. Techs., Inc. v. PNC Fin. Servs. Group, Inc.,
   226 Fed. Appx. 192 (3d. Cir. 2007)....................................................... 11

Snowden v. Henning,
   72 F.4th 237 (7th Cir. 2023)...........................................................passim

State Oil Co. v. Khan,
   522 U.S. 3 (1997)................................................................................... 32

Taylor v. Clark,
   821 F. Supp. 2d 370 (D.D.C. 2011)....................................................... 10

Trump v. Carroll,
   292 A.3d 220 (D.C. 2023) ..............................................................passim

Tun-Cos v. Perrotte,
   922 F.3d 514 (4th Cir. 2019)............................................................34, 35

United States v. Clapp,
   46 F.3d 795 (8th Cr. 1995)..................................................................... 47

United States v. King,
  781 F. Supp. 315 (D.N.J. 1991) ................................................................. 21
Vanderklok v. United States,
  868 F.3d 189 (3d. Cir. 2017) .................................................................... 10
Wallace v. Kato,
  549 U.S. 384 (2007) ....................................................................... 33, 38, 40
Watkins v. Mohan,
  144 F.4th 926 (7th Cir. 2025),
  *pet. for cert. filed*, No. 25-952 (U.S. Feb. 11, 2026) .................... 27, 31, 35, 42
Wilkie v. Robbins,
  551 U.S. 537 (2007) ............................................................................ 27, 33
Wilson v. Russo,
  212 F.3d 781 (1999) ........................................................................... 46, 47
Xi v. Haugen,
  68 F.4th 824 (3rd Cir. 2023) .............................................................. 35, 39, 41
Ziglar v. Abassi,
  582 U.S. 120 (2017) ............................................................................. passim

**Constitution, Statutes, Rules**

U.S. Const. amend. IV ............................................................................. passim
18 U.S.C. § 7 ....................................................................................... 20
18 U.S.C. § 13 ...................................................................................... 20
28 U.S.C. § 1495 ............................................................................... 40, 41
28 U.S.C. § 2679 ................................................................................. passim
40 U.S.C. § 3112 .................................................................................. 21
42 U.S.C. § 1983 ........................................................................... 26, 49, 50
Hyde Amendment, Departments of Commerce, Justice, State, and the
Judiciary, and Related Agencies, Appropriations Act, 1998, Title VI, § 617,
Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997) .................................. 40, 41
N.J.S.A. 2C:18-3 ................................................................................... 44
Fed. R. Civ. P. 7.2 .................................................................................. 0
Fed. R. Civ. P. 12 ................................................................................... 7
Fed. R. Crim. P. 9 ................................................................................. 39

**Other Authorities**

Restatement (Second) of Agency § 228.....................................................passim

Restatement (Second) of Agency § 229.....................................................passim

Restatement (Second) of Agency § 235.....................................................13, 20

## I.    PRELIMINARY STATEMENT

The Plaintiff in this action, Ras Baraka, is the elected mayor of Newark, the most populous city in the State of New Jersey. In Newark sits Delaney Hall, the largest detention center on the east coast, which has garnered statewide and national attention in connection with its unsafe and unsound conditions and operations. Mayor Baraka, a skilled orator, attracted widespread public support and national media attention for his criticism of Delaney Hall. It is for this reason that he was targeted, falsely arrested, and maliciously prosecuted on a false charge of trespass.

Defendants endeavor to shield themselves from any accountability in connection with his violent arrest. First, they claim that the court lacks subject matter jurisdiction to hear the matter; never mind that it is standard for discovery to proceed in connection with jurisdictional, factbound questions concerning scope of employment, particularly given the outrageousness of the conduct, which is indicia of scope outside of employment. Second, they claim that what happened to the Mayor is something other than the standard false-arrest-and-malicious-prosecution Fourth Amendment violations that courts regularly hear and decide. Here, they again claim that the violations alleged are beyond the reach of the judiciary.

While trying to differentiate the facts here from Fourth Amendment *Bivens* cases, Defendants miss the forest for the trees. The Mayor was arrested on public, state-owned property, on a false charge of the petty offense of trespass without

1

probable cause. The violation did not relate to the Mayor's immigration status, or the congressional inspection of the facility. It occurred separately, on public property; in other words, a typical search and seizure case.

Defendants *knew* that the Mayor was invited to enter the outer gate of the detention center, where he stood without incident for forty-five minutes. After all, Mayor Baraka could not have gained entry but for a guard's permission. How else could he have gained access? There was no allegation in the Affidavit supporting his criminal prosecution that he somehow broke into or sneaked onto the facility. Nor did the Affidavit mention that he voluntarily departed. Further, the media campaign that Habba instigated about the public and violent arrest and his malicious prosecution was riddled with falsities and fearmongering.

The entire episode was not in service to the American people; it was in service to private, partisan, and political motives. Despite their protests, Defendants' actions are not outside of the bounds of judicial review.

## II.    STATEMENT OF FACTS

The day she was sworn into office on March 28, 2025, as the interim U.S. Attorney, Defendant Habba announced her plan for her office: *"We could turn New Jersey red . . . Hopefully, while I'm there [in office], I can help that cause."* Am. Compl. ¶ 12. She then announced on Fox News her intent to "investigate" New

2

Jersey's Democratic Governor and his appointed Attorney General for thwarting President Trump's immigration policies. *Id.* ¶ 13.

Five weeks later, on May 9, 2025, three members of Congress arrived at Delaney Hall, a detention center based in Newark, NJ, which is owned and operated by the GEO Group, for a statutory inspection of the facility. *Id.* ¶ 14. Mayor Baraka was invited to join them for a press conference after the inspection, to be held outside of Delaney Hall, on public Newark property. *Id.* ¶ 15.

Mayor Baraka, a Democrat, had long made many public comments vocally opposing the abuse and mistreatment of immigrants by the Trump Administration and the controversial reopening of Delaney Hall following its closure. *Id.* ¶ 9. The GEO Group, a private prison company which contracts with DHS to operate the ICE detention facility, had repeatedly denied access to Newark officials seeking to conduct necessary and legally required inspections. *Id.* ¶ 8-10. Mayor Baraka continually sought to ensure the safety and health of residents in his City as part of his duty as Mayor, including those at Delaney Hall. *Id.* ¶ 10.

Thus, on May 9, 2025, he arrived early to join the peaceful public gathered outside of the fence. *Id.* ¶ 18, 19. A GEO guard at the gate invited the Mayor to enter inside the fence to "calm the crowd." Thus, the guard opened the gate and invited the Mayor inside the privately owned and operated property. *Id.* ¶ 20. For forty-five

3

minutes, the Mayor waited where he was instructed to stand, just a few feet inside the fence surrounding Delaney. *Id.* ¶ 21.

Later, Defendant Patel suddenly appeared and told the Mayor to leave. The Mayor explained that he was invited onto the property, which Patel immediately disputed. *Id.* ¶ 22. The members of Congress observed the dispute from afar in the building and walked towards the gate to speak with the Mayor. *Id.* ¶ 23. They explained to Patel that they had been waiting over an hour for the inspection and expressed a desire for the Mayor to join them. Patel's response was to threaten to arrest the Mayor. *Id.* ¶ 24. The Mayor thus responded: "I'm leaving now" to which Patel said, "Okay, go." The Mayor complied and exited the GEO property through the gate, and joined the public property outside of the facility. *Id.* ¶ 24-26.

Five minutes later, approximately 20 DHS agents, many armed and masked, descended on the Mayor and the members of Congress while on public property, without any attempt to calm fears or ensure peace. *Id.* ¶ 28-29. Egged on by Patel, who ordered the DHS agents to "take him down" (meaning violently tackle the Mayor), the agents pushed, shoved and assaulted the Mayor's security team and members of Congress before violently pulling Mayor Baraka's arms and arresting him without probable cause for an alleged petty offense. *Id.* ¶ 30-31. The Mayor was brought to a DHS facility and interviewed for approximately thirty (30) minutes,

4

during which he again explained that he was invited onto the GEO Group property by a GEO employee and that he left the property when ordered to do so. *Id.* ¶ 33.

The Mayor left Delaney Hall at 3:07pm. *Id.* ¶ 32. Two minutes earlier, at 3:05pm, before the Mayor was even transported from Delaney Hall, and hours before the U.S. Attorney filed a complaint, and before he was fingerprinted, photographed, and interviewed, Habba issued a false, defamatory statement on her *personal* social media account. *Id.* ¶ 33-34. She tweeted:

> The Mayor of Newark, Ras Baraka, committed trespass and ignored multiple warnings from Homeland Security Investigations to remove himself from the ICE detention center in Newark, New Jersey this afternoon. He has willingly chosen to disregard the law. That will not stand in this state. He has been taken into custody. NO ONE IS ABOVE THE LAW.

*Id.* Habba later participated in a telephone interview with Fox News, where she continued to make false and defamatory statements, including but not limited to: "He refused to leave, was put under arrest inside the facility, walked out when he was told he was under arrest, and then was cuffed." *Id.* ¶ 36. "The Mayor was inside and told he would be under arrest inside when he refused to leave after several notifications that he should remove himself. He chose not to do so and then was placed under arrest when he walked out of the facility." *Id.* False and defamatory statements continued thereafter during the pendency of his resulting criminal prosecution by a DHS spokesperson promoting a false narrative supported by Habba, including that the Mayor "stormed" and was "storming" an ICE facility, "putting

5

detainees at risk", "putting law enforcement at risk", "he's joined by a mob of people", and that the Mayor "broke into a detention facility." *Id.* ¶ 39.

Defendants Habba and Patel conspired, with others, to abuse their offices and effectuate the arrest premised on a knowingly false Affidavit stating that the Mayor "did, knowing that he was not licensed or privileged to do so, enter and remain in a place as to which notice against trespass was given." *Id.* ¶ 40. The alleged offense was purportedly in violation of Title 18, USC Section 13 and N.J.S.A. 2C:18-3. *Id.* The Affidavit further details that the Mayor "unlawfully entered and remained in the Delaney Hall Facility." *Id.*

After video became public showing that the Defendants had lied, falsely arrested, and maliciously prosecuted the Mayor, Habba threatened him with more false charges, claiming that she would charge him with resisting arrest if he did not agree to give up his right to sue for attorneys' fees. He refused. *Id.* ¶ 49. Ten days later, on May 19, Habba moved to dismiss the charges against the Mayor. *Id.* ¶ 50. The motion was granted on May 21, 2025, at which time Judge Espinosa admonished the Office of the United States Attorney in its handling of the matter, in part, reminding it of its role:

> *to serve a singular paramount client: Justice itself. Your role is not to . . . advance political agendas. . . .* The hasty arrest of Newark Mayor Ras Baraka, followed swiftly by a dismissal of these trespassing charges a mere 13 days later, suggests a worrisome misstep by your Office. An arrest, particularly of a public figure, is not a preliminary

6

investigative tool. It is a severe action, carrying significant reputational and personal consequences, and it should only be undertaken after a thorough, dispassionate evaluation of credible evidence. . . . The apparent rush in this case, culminating today in the embarrassing retraction of charges, suggests a failure to adequately investigate, to carefully gather facts, and to thoughtfully consider the implications of your actions before wielding your immense power. Your Office must operate with a higher standard than that.

*Id.* ¶ 51.[1]  This litigation follows.

### III.   STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, the court must assume that all allegations are true and draw all inferences in the plaintiff's favor, much like a 12(b)(6) motion. If the motion challenges the actual existence of subject-matter jurisdiction, the court makes no presumptions of truth and may weigh evidence outside of the pleadings to resolve jurisdictional facts. *See Gould Electronics Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

"To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible

---

[1]     The Transcript is incorporated at length in the Amended Complaint. *Id.* at pp. 11-13. *See also U.S. v. Baraka*, 25-mj-11131 (USDNJ) (May 21, 2025 Transcript of Motion to Dismiss).

on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid*. Dismissal is proper only if, upon "accepting all factual allegations as true and construing the complaint in the light most favorable to the plaintiff," no reasonable reading of the complaint can offer the plaintiff relief. *McMullen v. Maple Shade Twp.*, 643 F.3d 96, 98 (3d Cir. 2011) (quotation marks and citation omitted).

## IV.    LEGAL ARGUMENT

**1. The complaint states common law claims against Habba in her personal capacity, and the Court has subject matter jurisdiction to resolve the question of whether she was operating within or outside her scope of employment. Discovery is both necessary and standard to resolve the question.**

The Government argues that the defamation and libel claims should be dismissed on the premise that the Federal Tort Claims Act ("FTCA") is the exclusive remedy, rendering the government immune from defamation related claims. Thus, the Government argues that there is no subject matter jurisdiction over the torts. However, the complaint is brought against Habba in her *personal* capacity pursuant to common law, and presents allegations that reasonably infer that Habba was working outside of the scope of federal employment because she was motivated by a personal, political agenda rather than the fair administration of justice. Therefore, the FTCA does not apply here. While the Government has submitted a Westfall Act

8

certification alleging that Habba was working within the scope of the employment, the Court retains subject matter jurisdiction to resolve the question and must permit discovery to do so. Accordingly, the motion to dismiss should be denied.

It is well settled that the determination of whether an employee was acting within the scope of employment pursuant to the Westfall Act is subject to judicial review. *See Osborn v. Haley*, 549 U.S. 225, 230 (2007); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995). "Just as the Government's certification that an employee was acting within the scope of his employment is subject to threshold judicial review, a complaint's charge of conduct outside the scope, when contested, warrants immediate judicial investigation." *Osborn*, 549 U.S. at 247 (cleaned up).

Habba relies heavily on *Osborn* in asserting that "[b]y operation of law [the Westfall Act] certification substitutes the United States as the exclusive defendant." Defs. Br. at 9. Yet, Habba fails to address the controlling Supreme Court holding in *Gutierrez de Martinez v. Lamagno*, which expressly mandates a factual determination on the scope of employment and thus precludes granting a motion to dismiss based on the Westfall Act certification. 515 U.S. 417, 420 (1995). While *Osborn* governs the automatic removal of cases from federal to state court pursuant to the submission of a Westfall Act certification, *Gutierrez* governs the

9

reviewability of the substitution of the United States in matters already before federal court —the exact issue currently before this Court.[2]

It is self-evident that a state law claim against a federal employee can proceed where she acts outside of her scope of employment, pursuant to the law of *respondeat superior* of the state in which the act or omission occurred. *Vanderklok v. United States*, 868 F.3d 189, 201-204 (3d. Cir. 2017). *See also CNA v. United States*, 535 F.3d 132, 146 (3d Cir. 2008), *as amended* (Sept. 29, 2008).

## A. The Second Restatement of Agency applies in New Jersey and directs a fact-bound inquiry.

New Jersey adheres to the Second Restatement of Agency in delineating the scope of employment, *Carter v. Reynolds*, 175 N.J. 402, 411 (2003), "subject to analysis under Restatement sections 228 and 229."

Section 228 provides:

(1)     Conduct of a servant is within the scope of employment if, but only if:

---

[2]     *See also e.g., Carroll v. Trump*, 49 F.4th 759, 765 (2d Cir. 2022) (certifying question to the District of Columbia); on certification, *Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) (en banc) (clarifying applicable standard); *Bowles v. United States*, 685 F. App'x 21, 26 (2d Cir. 2017) (affirming denial of substitution after Attorney General's certification); *Taylor v. Clark*, 821 F. Supp. 2d 370, 373 (D.D.C. 2011); *Garcia v. United States*, 88 F.3d 318, 320 (5th Cir. 1996) (same); *Melo v. Hafer*, 912 F.2d 628, 639-42 (3d Cir. 1990) (allowing district court to review whether defendant was acting within scope of employment before permitting substitution of United States and dismissal on sovereign immunity grounds), *aff'd Hafer v. Melo*, 502 U.S. 21 (1991) (affirming on other grounds, without addressing the issue of substitution).

> (a)    it is of the kind [the person] is employed to perform;
>
> (b)    it occurs substantially within the authorized time and space limitations;
>
> (c)    it is actuated, at least in part, by a purpose to serve the master; and
>
> (d)    if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2)    Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

Restatement (Second) of Agency § 228. Noteworthy is the "and" prescription; conduct is within the scope of employment if it meets all the factors. *Matsko v. United States*, 372 F.3d 556, 559 (2004). *Cf. Trump v. Carroll*, 292 A.3d 220, 230 (D.C. 2023) (the "determination of scope of employment is dependent upon the facts and circumstances of each case.").

It is the plaintiff's burden to prove the adherence to or departure from an employee's "motivat[ion], 'at least in part, by a purpose to serve'" the master. *Siemens Bldg. Techs., Inc. v. PNC Fin. Servs. Group, Inc.*, 226 Fed. Appx. 192, *195-97 (3d. Cir. 2007), *quoting Carter*, 175 N.J. at 411. A "core issue" emerges, which is the employee's "intent" and whom she is "motivated, in whole or in part" to serve. *Id.* at *196. Although intent is usually an issue for trial, its adjudication should be prioritized here, and discovery should be allowed on the question because it relates to subject matter jurisdiction.

11

Section 229 sets out additional facts for consideration, including "the previous relations between the master and servant"; "whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;" and "the extent to which the departure from the normal method of accomplishing an authorized result."[3] Restatement (Second) of Agency § 229.

---

[3]    Section 229 provides, in full:

(1)    To be within the scope of the employment, conduct must be of the same general nature as that authorized or incidental to the conduct authorized.

(2)    In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a)    *Whether or not the act is one commonly done by such servants*;
(b)    *The time, place and purpose of the act*;
(c)    *The previous relations between the master and servant*;
(d)    The extent to which the business of the master is apportioned between different servants;
(e)    *Whether or not the act is outside the enterprise of the master* or, if within the enterprise, has not been entrusted to any servant;
(f)    *Whether or not the master has reason to expect that such an act will be done*;
(g)    The similarity in quality of the act done to the act authorized;

12

Last, Section 235 defines "Conduct Not for Purpose of Serving Master":

> An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed.

Restatement (Second) of Agency § 235.[4]

## B. The complaint presents a live controversy for which relief is plausible.

Here, the Office of the U.S. Attorney for the District of New Jersey is the federal law enforcement office for the State of New Jersey. The office purportedly has no partisan or personal agenda; its purpose is to serve the U.S. Constitution. *See*

---

    (h)    *Whether or not the instrumentality by which the harm is done has been furnished by the master to the servant*;

    (i)    *The extent to which the departure from the normal method of accomplishing an authored result*; and

    (j)    Whether or not the act is seriously criminal.

    Restatement (Second) of Agency § 229 (emphasis added).

[4] Comment C further explains the probative value of outrageous acts. "The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business. In such cases, the facts may indicate that the servant is merely using the opportunity afforded by the circumstances to do the harm." Restatement (Second) of Agency § 235. The associated Illustration provides the example of a trespasser, where trespass could have been prevented simply by calling someone away from entering a premise, but they are instead shot and killed. The Restatement explains that such an illustration evidences that "A was not actuated by an intent to perform his master's business and hence that his act was not within the scope of his employment." *Id*.

*Berger v. United States*, 295 U.S. 78, 88 (1935). "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all. . . . It is as much [her] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id*. It is axiomatic that acts in furtherance of private, personal, partisan ends fall outside the scope of the Office, and outside the scope of employment. Simply put, speech in furtherance of personal gain is not "of the kind [the person] is employed to perform[.]" Restatement (Second) of Agency § 228(1)(a). *See also Carroll*, 292 A.3d at 230.

The inquiry here focuses on Habba and the extent to which her conduct – when she took to her *personal* social media account and then a wider publicity tour, to defame and libel an elected official, as a part of a wider scheme to charge him for trespass falsely and very publicly and violently arrest him for a petty offense of trespass (knowing he was invited onto the property, and left it voluntarily), and then federally prosecute him for that offense (knowing that the property outside of Delaney Hall is not a federal enclave) – was "actuated, at least in part" by a purpose to serve the American people in the pursuit of justice, or whether it was to serve some other private, personal, or partisan purpose. Restatement (Second) of Agency § 228(1)(c); § 229(2)(a)-(c), (f), (h), (i). *See also Matsko v. United States*, 372 F.3d

14

556 (3d Cir. 2004) (viewing the aggregate of a federal employee's actions, finding that Section 228(c) is not satisfied where using excessive force, a federal employee assaulted a visitor motivated by personal animus rather than an intent to serve the United States).

Here, there is at least a justiciable question of whether there is a justiciable factual issue regarding whether Habba was acting pursuant to a personal animus as opposed to serving the American people. Thus, for example, U.S. Magistrate Judge Espinosa excoriated Habba's handling of the case, suggesting improper conduct that can reasonably be deemed violative of Section 228(1)(a) and (c).

Upon granting voluntary dismissal, Judge Espinosa strongly admonished the Office, reminding of its role:

> *to serve a singular paramount client: Justice itself. Your role is not to . . . advance political agendas. . . .* The hasty arrest of Newark Mayor Ras Baraka, followed swiftly by a dismissal of these trespassing charges a mere 13 days later, suggests a worrisome misstep by your Office. An arrest, particularly of a public figure, is not a preliminary investigative tool. It is a severe action, carrying significant reputational and personal consequences, and it should only be undertaken after a thorough, dispassionate evaluation of credible evidence. . . . The apparent rush in this case, culminating today in the embarrassing retraction of charges, suggests a failure to adequately investigate, to carefully gather facts, and to thoughtfully consider the implications of your actions before wielding your immense power. Your Office must operate with a higher standard than that.

Am. Compl.  ¶ 51 (emphasis added). Indeed, Habba's actions amounted to a purposeful targeting of and attack on Mayor Baraka for his longstanding, forceful condemnation of Delaney Hall, located within the City of Newark, including for its unsafe and unsound conditions. Am. Compl. ¶ 9-10. Mayor Baraka, a skilled orator, attracted widespread public support and national media attention for his criticism of Delaney Hall. *See* Am. Compl. ¶¶ 9-10, 16. Thus, when Habba articulated her goal on the very day she was sworn in as Interim U.S. Attorney – to help Republicans, led by her longtime, close former client Donald Trump – and then arrested and defamed Mayor Baraka five weeks later – a genuine question is raised, concerning which master she was serving – that of Justice, or that of a personal, political agenda. *See* Am. Compl.  ¶¶ 11-13.

Thus, on the day of her installment, on national media she made her intent clear: "*We could turn New Jersey red . . . Hopefully, while I'm there [in office], I can help that cause.*" *See* Am. Compl. ¶ 12. She similarly warned that she would target Democratic elected officials in New Jersey who defended immigrant rights, and whom she deemed as standing in the way of her past-and-present boss's immigration agenda. Am. Compl. ¶¶ 12, 13. The incidents at Delaney Hall which animate the underlying litigation took place only five weeks later. *See* Am. Compl. ¶¶ 12-14.

Accordingly, before the Mayor was even transported from Delaney Hall on May 9, 2025, Habba took to her *personal* social media account, to tweet:

16

> The Mayor of Newark, Ras Baraka, committed trespass and ignored multiple warnings from Homeland Security Investigations to remove himself from the ICE detention center in Newark, New Jersey this afternoon. He has willingly chosen to disregard the law.

Am. Compl. ¶ 23. That the alleged petty offense of "defiant trespass" merited public, violent arrest and handcuffing (Am. Compl. ¶¶ 30, 31), even after the Mayor voluntarily and promptly left the property (Am. Compl. ¶¶ 22-29), and that Habba immediately took to Twitter/X despite having knowledge of clear evidence that the Mayor did not commit that misdemeanor crime, further illustrates that she was animated by her personal reasons to suppress Democratic Party electeds, quell immigrant rights advocates, and serve a master other than the unbiased pursuit of justice. Am. Compl. ¶¶ 34-35. Habba admitted that she would use her office to "turn New Jersey red" and that she would target New Jersey public leaders and electeds who stood in the way of Trump's immigration agenda. Am. Compl. ¶¶ 12, 13.

Upon learning of the Mayor's arrest at Delaney Hall, the Director of the Department of Public Safety for the City of Newark called Habba directly on the afternoon of May 9, 2025, who confirmed the arrest. Opposition Br., Exhibit A, Declaration by Director Emmanuel Miranda, ¶ 19.[5] Director Miranda's Declaration

---

[5]    As discussed above, because the Department of Justice has called into question the Court's subject matter jurisdiction over the state law claims, claiming they are subsumed by the Federal Tort Claims Act ("FTCA") and therefore subject to absolute immunity, Defs. Br. at 8-13, the Court may consider extrinsic evidence in order to resolve jurisdictional facts, including the extent to which a live case or

demonstrates motive outside of the bounds of the fair and ordinary administration of justice and gives rise to the reasonable inference that Mayor Baraka was intentionally targeted.

The Miranda Declaration is replete with details contextualizing the "outrageous[ness]" of the overall scheme, *supra* n. 3 and accompanying text (outrageous acts as illustrative of conduct outside of scope). *See e.g., id.* ¶¶ 14 ("highly unusual"); 13, 15, 16, 23 ("very unusual"), 24-27 (federal agents lack jurisdiction outside of Delaney Hall to charge state-level offenses), 30 ("does not make any sense"). Based on his twenty-five years of experience on the Newark Police force, including previously serving as Chief of Police, Detective Miranda's "overall impression is that the entire episode related to the events which led to the arrest of Mayor Baraka all was just a political stunt." *Id.* ¶ 31.

Defendant Habba continued to make false and defamatory statements in the interim days before ultimately dropping her prosecution of Mayor Baraka, including but not limited to going on Fox News to state that the Mayor "refused to leave, was put under arrest inside the facility, walked out when he was told he was under arrest, and then was cuffed;" and that "[t]he Mayor was inside and told he would be under

---

controversy is present. *See Gould*, 220 F.3d at 176. The Court should therefore consider the Miranda Declaration in evaluating the question of scope-of-employment, which is inherently an inquiry of purpose and motivation, to determine whether the Court has jurisdiction.

arrest inside when he refused to leave after several notifications that he should remove himself. He chose not to do so and then was placed under arrest when he walked out of the facility." Am. Compl. ¶ 36. These statements were made although Defendant Habba was aware that the Mayor did not commit trespass, did not refuse to leave the ICE detention center in Newark (he was on the outside perimeter of the facility along the gate, where he was instructed to stand), did not ignore multiple warnings to leave the facility, and had not "willingly chosen to disregard the law." Am. Compl. ¶ 37. The media tour continued, during which promoted a narrative that "members of Congress and the Mayor and a mob of protesters stormed the gate" at Delaney Hall; that the Mayor was "storming an ICE facility . . . putting detainees at risk, putting law enforcement at risk; he's joined by a mob of people"; that the Mayor "broke into a detention facility" and so on. Am. Compl. ¶¶ 39.

At a minimum, Defendant Habba had sufficient information to know there were serious doubts about the truth of her statements, and she deliberately ignored facts in furtherance of her personal, partisan vendetta well outside her scope of employment. *See* Am. Compl. ¶ 38. In fact, as the complaint alleges, and as will be borne out in discovery, the Mayor was invited and granted entry to the outside permitter of the facility, and remained at the location he was instructed to stand. He was told to do so by a GEO guard, the privately contracted company that runs the facility. He left upon being ordered to by someone who is not a representative of the

19

owner of the property; and he was ultimately arrested outside of the facility's grounds and on public property, despite complying with an order to depart. Am. Compl. ¶¶ 40-42. This is clear indicia that the Mayor did not commit the petty offense of trespass. Further, Habba's statements ignore that the escalation and violent behavior was instigated by ICE. Am. Compl. ¶¶ 29-31. All these facts are probative to subject matter jurisdiction and can be the subject of discovery and factual determination now, as they go to Habba's intent and motivation; but at the very least, they cannot be ignored on a motion to dismiss without full factual exploration.

Notably, the charge of trespass here, and the resulting false statements, parallel the very illustration proffered by the Restatement in evaluating the probative value of "outrageous acts" to define "conduct not for purpose of serving master." Restatement (Second) of Agency § 235 and Comment C, *supra* n. 2 and related text.

That federal agents arrested the Mayor for a state-level offense on state property further demonstrates the "outrageous" nature of the scheme. The Assimilative Crimes Act, 18 U.S.C. § 13(a), on which the Mayor's trespass violation and prosecution rests (*See* Am. Compl. ¶ 40), assimilates state law crimes as federal law when the defendant commits "non-federal crimes" on a federal enclave acquired pursuant to 18 U.S.C. § 7. It is a method of using local law to fill gaps in federal criminal law on territory that is considered a federal enclave as defined by 18 U.S.C. § 7(3), which requires notice by the United States government and consent by the

20

State. To establish federal criminal jurisdiction, Congress created a system of notice and consent; if not satisfied, "[i]t is conclusively presumed that [federal] jurisdiction has not been accepted[.]" 40 U.S.C. § 3112(c).

The notice requirement creates a method of federal acceptance of jurisdiction, so that all persons could know whether the United States was asserting "no jurisdiction, concurrent jurisdiction, or exclusive jurisdiction" over its acquired lands. *Adams v. United States*, 319 U.S. 312, 314 (1943) (since the United States had not accepted jurisdiction in the manner required, federal agents could not prosecute a state offense committed on a government military camp because it lacked federal criminal jurisdiction). Note here, that while the GEO guard invited the Mayor on the property and instructed him to remain there, the federal agents who do not own or operate the property later asserted otherwise. And note that the Mayor was arrested on public, state property. Am. Compl. ¶ 22. "The United States has the burden of proving that federal jurisdiction exists." *United States v. King*, 781 F. Supp. 315, 316 (D.N.J. 1991) (M.J. Simandle) (finding lack of federal criminal jurisdiction where the United States had not exercised practical dominion over a parking lot, because it leased only a portion of the lot and has no control over the remainder of the parcel, and "most importantly", because it has not shown requisite notice.)

Here, Habba has not yet provided any proof that any portion of the lot outside of Delaney Hall, neither within the outer perimeter of the fenced area leased and

21

operated by the GEO Group (See Am. Compl. ¶ 20), and certainly not outside of the fence on the public property where the Mayor was arrested (*See* Am. Compl. ¶ 30), is a federal enclave. *Accord* Miranda Decl. ¶¶ 24-27, 30. These facts call into question the "outrageous" nature of the conduct as indicia of scope of employment, and a specific factor of the inquiry, regarding her inability to satisfy the proper time, place, and manner requirements of the Restatement (Second) of Agency. *See* Restatement (Second) of Agency § 228(1)(b); §§ 229(2)(b), -2(e), -2(h), -2(i). Prosecutors do not have wide latitude if there is an open question of law, because they have time to investigate the authority to prosecute in advance, as U.S. Magistrate Judge Espinosa reminded here. That Habba did not do so and then went on a media circuit to double down, further lends to the plausible inference that the scheme was animated for a non-governmental purpose.

Recently, in a case concerning statements made up to and on January 6, 2021, including the President's speech and his tweets on X/Twitter, the District Court for the District of Columbia applied the Second Restatement of Agency to strike the United States's Westfall Act Certification. *Lee v. Trump*, No. 21-cv-400, 2026 U.S. Dist. LEXIS 69924, 2026 WL 880161, at *36-38 (D.D.C. Mar. 31, 2026). The District Court found that the President failed to meet his burden of showing that his alleged conduct fell within his official duties.

22

Specifically, *Lee* recognized that actions in furtherance of personal, partisan gain are not a function of federal employment:

> The presidency itself has no institutional interest in who will occupy the office next. Campaigning to attain that office thus is not an official function of the office. And, importantly, 'an incumbent President's interests in winning re-election have the same purely private character as those of his challengers.

*Lee v. Trump*, 2026 WL 880161, at *26, quoting *Blassingame v. Trump*, 87 F.4th 1, 463 U.S. App. D.C. 442 (D.C. Cir. 2023) (internal quotation and citations omitted). Accordingly, the court rejected the United States's attempt to substitute itself as a defendant and to therefore claim absolute immunity.

The consideration of a Westfall Act certification was also recently litigated in a tort defamation claim brought by E. Jean Carroll against the President in his personal capacity. *Carroll v. Trump*, 498 F. Supp. 3d 422, 457 (S.D.N.Y. 2020); rev'd in part and vacated in part, *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022) (requesting clarification of the District of Columbia's *respondeat superior* case law), on certification, *Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) (en banc).

Notably, the District of Columbia Court of Appeals, the highest court for the District, offered a detailed review of the Second Restatement of Agency as applied in that jurisdiction, and expressly "decline[d] to address the factbound question of whether the former President was acting within the scope of his employment." *Id.* at

23

225. The high court explained: "It is not at all clear to us that the [Westfall Act] requires an answer to this scope-of-employment question as a matter of law at this preliminary stage." *Id.* at 225-26. The court recognized that it would be inappropriate to accept substitution absent *full* development of the record on that question.

> The timing of when the court must address the scope-of-employment question is somewhat different here than in a traditional civil suit because the court is being asked to determine whether an individual was an employee acting within the scope of their employment prior to discovery rather than after the full development of the record on that question. More importantly, the answer to the scope-of-employment question could have the effect of ending the case before a merits determination is made because the United States has not waived its sovereign immunity for the tort of defamation. . . . [S]ubstitution of the United States prevents a federal court from maintaining the litigation and consequentially bars Ms. Carroll from recovering in any capacity because her case would be dismissed should the motion to substitute be granted.

*Id.* at 227.

Both *Lee* and *Carroll* offer recent guidance on the application of the Second Restatement of Agency (which New Jersey follows) in the context of the Westfall Act certification concerning ongoing conduct, including speech conduct. They counsel in favor of allowing the completion of full discovery. Note that the Westfall Act certification was presented and struck in *Lee* at the summary judgment phase following discovery, and that the take away from *Carroll* is that the question presented is "factbound" and deserving of "full discovery" before determining the

24

sufficiency of the motion to substitute the United States as a party therein pursuant to a Westfall Act certification, which would in effect grant dismissal and bar relief.

Here, Mayor Baraka has pleaded facts which must be assumed to be true and interpreted in the most favorable light to him, and which reasonably demonstrate that the conduct performed was outside of the scope of federal employment.

The Department of Justice's motion to dismiss the common law claims of defamation and libel for lack of subject matter jurisdiction should therefore be flatly denied. The Court should allow for the conduct of full discovery, deny the presumed automatic substitution of the United States as a party in this action, and grant the plaintiff leave to file a motion to strike the Certification following discovery.

## 2. The complaint states Fourth Amendment claims under *Bivens*.

"When government officials abuse their offices, actions for damages may offer the only realistic avenue for vindication of constitutional guarantees." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (per Scalia, J.) (cleaned up). That's surely the case when law enforcement agents make arrests or initiate criminal charges when none are warranted, as certainly – really, admittedly – occurred here. Consequently, in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the Supreme Court held that the victim of an illegal warrantless arrest could seek damages in federal court under the Fourth Amendment from the responsible agents.

25

*Id*. at 397. The Court subsequently extended *Bivens* to a congressional staffer's Fifth Amendment discrimination claim, *see Davis v. Passman*, 442 U.S. 228 (1977), and to a claim that prison officials violated an inmate's Eighth Amendment rights through deliberate indifference to his serious medical needs, *see Carlson v. Green*, 446 U.S. 14 (1980).

More recent Supreme Court decisions have dramatically limited *Bivens* actions such that they no longer broadly function (as they once did) as "the federal analog to suits brought against state officials under Rev. Stat. § 1979, 42 U.S.C. § 1983," *Hartman v. Moore*, 526 U.S. 250, 254 n.2 (2006). *See Ziglar v. Abassi*, 582 U.S. 120, 134 (2017); *Hernández v. Mesa*, 589 U.S. 93 (2020); *Egbert v. Boule*, 596 U.S. 482 (2022); *Goldey v. Fields*, 606 U.S. 942 (2025) (per curiam). These recent cases reflect a determination that separation of powers concerns constrain judicial creation of damages remedies and that such causes of action are "most often" best left for Congress to create. *See Ziglar*, 582 U.S. at 135. On that premise, "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ibid*. On the other hand, the Court has stressed that *Bivens* remains good law in the "common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, [is] powerful reasons to retain it in that sphere." *Id*. at 134.

**A. *Bivens* remains precedent in the search and seizure context.**

Although the current Supreme Court has criticized *Bivens*, it "repeatedly has declined to overrule [it]." *Watkins v. Mohan*, 144 F.4th 926, 933 (7th Cir. 2025) (cleaned up), *pet. for cert. filed*, No. 25-952 (U.S. Feb. 11, 2026). "The Court took great care in making this point in [*Ziglar v.*] *Abassi*, emphasizing that its holding restricting the availability of a *Bivens* remedy was 'not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose.'" *Hicks v. Ferreyra*, 64 F.4th 156, 166 (4th Cir. 2023) (quoting *Ziglar*, 582 U.S. at 134), *cert. denied*, 144 S. Ct. 555 (2024). Similarly, although some Justices have called for limiting *Bivens* and its progeny (*Davis* and *Carlson*) "to the precise circumstances that they involved," *Wilkie v. Robbins*, 551 U.S. 537, 568 (2007) (Thomas, J., joined by Scalia, J., concurring) (cleaned up); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., joined by Thomas, J., concurring), the Court has also declined to do that. Instead, it has "retain[ed]" *Bivens* in the "search and seizure context in which it arose," *Ziglar*, 582 U.S. at 134, while declining to extend it to new contexts. *See id*. at 135; *see also Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 564 n.2 (7th Cir. 2022) ("The opinion in *Egbert* is consistent with the Court's cutting back on the scope of *Bivens* but does not change our understanding of *Bivens*' continued force in its domestic Fourth Amendment context.").

27

Accordingly, when a plaintiff brings a *Bivens* claim, the court must evaluate whether the claim arises in the contexts for which *Bivens*, *Davis*, and *Carlson* approved damages remedies or whether the claim would extend the *Bivens* remedy to some new context. Only if the context is new, must a court further evaluate whether any "special factors counseling hesitation" foreclose the plaintiff's proposed *Bivens* extension. *Ziglar*, 582 U.S. at 139-40. *Ziglar* provided "some examples" of factors by which "a case might differ in a meaningful way" from an established *Bivens* context:

> A case *might* differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

582 U.S. at 139-40 (emphasis added). As the Court's use of "might" implies, the presence of any given factor does not necessarily make for a meaningful difference from *Bivens*. Indeed, applying the *Ziglar* factors in a mechanistic fashion would improperly reduce the inquiry to a rigid "all fours" test, contrary to the Supreme Court's determination to retain *Bivens* in the search and seizure context and to not limit it to its "precise circumstances." And so "[a] difference is 'meaningful' when it involves a factual distinction or new legal issue that might alter the policy balance that initially justified the implied damages remedies in the *Bivens* trilogy." *Snowden*

28

*v. Henning*, 72 F.4th 237, 239 (7th Cir. 2023); *see also id*. at 245 (Courts have found "a new context when there are separation-of-powers considerations different than those already present in the *Bivens* trilogy."); *accord Arias v. Herzon*, 150 F.4th 27, 34 (1st Cir. 2025) ("[T]he Supreme Court's requirement that a difference must be 'meaningful' suggests that *some* degree of variation will not preclude a *Bivens* remedy.") (cleaned up). Importantly, discrete factual differences cannot be taken in isolation. That would have the effect of limiting *Bivens* to its precise circumstance, a step the Court has declined to take. And "[t]he *Bivens* remedy has never been limited to claims brought by people harmed in the exact same manner, under the exact same conditions, by the same class of federal officers as those in *Bivens*, *Davis*, and *Carlson*." *Edwards v. Gizi*, 107 F.4th 81, 87 (2d Cir. 2024) (Robinson, J., concurring).[6]

---

[6] The Third Circuit's reference to "case[s] indistinguishable from *Bivens*, *Davis*, or *Carlson*," in *Fisher v. Hollingsworth*, 115 F.3d 197, 205 (3d Cir. 2024), does not establish that a claim must involve the precise circumstances of those three cases if it is to proceed. *See also* Defs. Brief at 14. The Third Circuit was addressing the question of what precedents guided the "new context" inquiry. The court of appeals explained that "[w]hen it formulated the first step, *Ziglar* did not specify which cases counted, although it elsewhere discussed *Bivens*, *Davis*, and *Carlson* as the relevant cases." *Id*. at 204 (footnote omitted). But *Egbert* later clarified that only *Bivens*, *Davis*, and *Carlson* count for assessing whether a "new context" is presented, and hence the Third Circuit's own precedents could not define an existing *Bivens* context. *See ibid*. In then applying the new context inquiry, the Third Circuit applied the "meaningful difference" test. It did not ask whether the case before it was "indistinguishable" from the Supreme Court's precedents as a factual matter. *See id*. at 216 ("We begin by asking whether Fisher's case differs meaningfully from *Bivens*, *Davis*, and *Carlson*.") (footnote omitted).

That is why *Bivens* search and seizure claims remain viable and why they are not limited to narcotics enforcement or searches and seizures in the home. For example, in *Hicks v. Ferreyra*, 64 F.4th at 156, the Fourth Circuit held that a U.S. Secret Service agent who was subjected to two unconstitutional traffic stops on a federal parkway had a valid *Bivens* action against U.S. Park Police officers and affirmed a $730,000 judgment against them. *See id*. at 162. The officers argued that Hicks' claim presented a new context because Hicks' home was not searched and that *Bivens* did not involve a prolonged traffic stop. They also emphasized that *Hicks* made no claim of excessive force and that unlike *Bivens* the case presented "a bizarre, inter-agency squabble within the [E]xecutive [B]ranch," that amounted to a special factor best left for Congress to address. *See id*. at 166. The Fourth Circuit disagreed. It acknowledged that under *Ziglar* and *Egbert*, "a radical difference is not required to conclude that a case presents a new *Bivens* context," but pointed out that nonetheless "the differences between the case at issue and *Bivens* must be "meaningful." *Ibid*. (cleaned up). Though Hicks' case did not involve narcotics officers, it did involve officers engaged in ordinary law enforcement operations, not the formulation of broad policy as in *Ziglar*. *See id*. at 167. The difference in the seizures at issue (a custodial arrest in *Bivens* and non-custodial traffic stops in *Hicks*) was also not meaningful. As in *Bivens*, the officers "confronted nothing more than established principles of Fourth Amendment law with extensive judicial guidance

30

regarding the right of individuals to be free from unjustified, warrantless seizures." *Ibid*. (cleaned up). The case also "had nothing to do with an 'inter-agency squabble within the [E]xecutive [B]ranch'" that implicated policy questions. *Ibid*. (cleaned up). Accordingly, none of the several factual differences from *Bivens* showed a new *Bivens* context. Instead, the case "involve[d] not an extension of *Bivens* so much as a replay of the same principles of constitutional criminal law prohibiting the unjustified, warrantless seizure of a person." *Id*. at 167 (cleaned up).

Other cases have likewise allowed *Bivens* remedies after *Ziglar* and *Egbert* despite clear (but not "meaningful") differences from *Bivens*. In *Snowden v. Henning*, the Seventh Circuit reversed a district court decision finding a new context. Though the incident involved an arrest in a hotel lobby under a warrant (unlike the warrantless arrest and use of force in the home in *Bivens*), and one DEA agent (not a raid team of six), none of these differences mattered "as a separation of powers matter." *Id*. at 246.[7]

---

[7]    The Seventh Circuit distinguished the Fifth Circuit's decision in *Oliva v. Nivar*, 973 F.3d 438 (5th Cir. 2020), in which the plaintiff alleged that VA police officers used excessive force at a checkpoint at a VA hospital. *See Snowden*, 72 F.4th at 247. The Fifth Circuit's decision also provides no guidance here. Most tellingly, the arrest in *Oliva* occurred at a security checkpoint inside the hospital. Mayor Baraka was arrested outside Delaney Hall after he complied with Patel's instruction to leave. What's more, "the Fifth Circuit requires a near exact factual match in the Fourth Amendment *Bivens* context." *Watkins*, 144 F. 4th at 951 n.* (Kirsch, J., concurring in part in the judgment and dissenting in part).

Similarly, in *Arias v. Herzon*, 150 F.4th 27 (1st Cir. 2025), the First Circuit allowed a *Bivens* action arising from excessive force DEA agents allegedly used to arrest the plaintiff in a parking lot. The court rejected arguments that the warrant meant that the agents acted under a different legal mandate than the agents in *Bivens*. *See id*. at 37-38. And "the fact that the allegedly excessive force took place in a parking lot rather than at a private home does not risk 'alter[ing] the policy balance that initially justified the cause[ ] of action recognized in *Bivens*' as 'a separation-of-powers matter.'" *Id*. at 38-39 (quoting *Snowden*, 72 F.4th at 244, 247) (brackets original). "Nor d[id] the defendants explain why, when these two features are considered together, their interaction would require a different conclusion than when either is considered alone." *Id*. at 39. Finally, emphasizing that "it is th[e] [Supreme] Court's prerogative alone to overrule one of its precedents," *id*. at 41 (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) (cleaned up), the court rejected the argument that the Inspector Generals Act was a new "special factor" that made for a new context. "[A]lthough Congress amended the IGA to create the administrative remedy that supposedly spelled *Bivens's* demise nearly forty years ago," it explained, "the Supreme Court has repeatedly and recently declined to overrule *Bivens*." *Ibid*. (citations omitted). To adopt the agents' argument, then, would be to determine that *Bivens* had been overruled, a step only the Supreme Court could take. *See ibid*.

**B. The Fourth Amendment false arrest claim here arises in the established *Bivens* context.**

32

*Bivens* claims are assessed for viability on a claim-by-claim basis. *See, e.g., Egbert*, 596 U.S. 482. Here, Mayor Baraka alleges that Patel arrested him for trespassing without a warrant and without probable cause. *See* Am. Compl. ¶¶ 55-61. This "false arrest" claim, *see Wallace v. Kato*, 549 U.S. 384, 387 (2007), falls in the "common and recurrent sphere of law enforcement" for which *Bivens* provides a remedy. The Government's contrary arguments are incorrect. By seizing on the kinds of immaterial differences that inevitably arise in the "common and recurrent sphere of law enforcement," the Defendants' reasoning would either improperly "cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context," *Ziglar*, 582 U.S. at 134, or it would improperly limit *Bivens* "to the precise circumstances that [it] involved," *Wilkie*, 551 U.S. at 568 (Thomas, J., joined by Scalia, J., concurring). Neither approach is faithful to the Supreme Court's precedents.

Like the Fourth Amendment claims in *Hicks*, *Snowden*, and *Arias*, Mayor Baraka's false arrest claim "involve[s] not an extension of *Bivens* so much as a replay of the same principles of constitutional criminal law prohibiting the unjustified, warrantless seizure of a person." *Hicks*, 64 F.4th at 167 (cleaned up). Though Patel is an immigration agent, as already explained, *Ziglar* did not limit *Bivens* liability to narcotics agents. In arresting Mayor Baraka for trespass as defined under New Jersey law, moreover, Defendants "confronted nothing more than established principles of

Fourth Amendment law with extensive judicial guidance regarding the right of individuals to be free from unjustified, warrantless seizures." *Ibid*. The factual differences between the false arrest claim here and the claim in *Bivens* are not "meaningful."

In arguing otherwise, Defendants miss the forest in carefully surveying the many trees, improperly focusing on immaterial factual differences. They compound that error by taking those differences in isolation. That is improper. The Court in *Ziglar* "did not, however, hold that any one of these factors, by itself, *necessarily* creates a meaningful difference. . . . . Instead, it must apply those factors to the nature of the claim to determine if the claim itself is meaningfully different." *Edwards*, 107 F.4th at 88 (Robinson, J., concurring). Defendants' arguments ignore that the Fourth Amendment false arrest claim here, like the claims in *Hicks*, *Snowden*, and *Arias*, is not meaningfully different from *Bivens*.

Citing the Third Circuit's nonprecedential opinion in *Barry v. Anderson*, No. 22-3098, 2023 WL 8449246 (3rd Cir. Dec. 6, 2023), they argue that ICE agents like Patel are a new category of defendant and that he "operate[s] under a different legal mandate than the agents in *Bivens*." Defs. Br. at 15. *Barry* involved an immigration operation, and the panel in that case found "persuasive" the Fourth Circuit's decision in *Tun-Cos v. Perrotte*, 922 F.3d 514 (4th Cir. 2019). *See Barry*, 2023 WL 8449246 at *3. But *Tun-Cos* distinguished between ICE agents enforcing immigration law

34

and officers "enforcing the criminal law, as in *Bivens*," *Tun-Cos*, 922 F.3d at 524. That distinction was meaningful because "immigration enforcement is by its nature addressed toward noncitizens, which raises a host of considerations and concerns that are simply absent in the majority of traditional law enforcement contexts." *Ibid*. But that distinction does not apply here. By no stretch were Defendants enforcing immigration law when Mayor Baraka was unjustifiably arrested for trespassing. At best, Defendants enforced criminal law. *See* Am. Compl.¶ 56. And as the Fourth Circuit's later *Hicks* decision shows, the defendant's employing agency and job responsibilities are not in themselves dispositive (and *Bivens* liability is not limited to narcotics agents enforcing the narcotics laws). Indeed, to hold otherwise would be to improperly limit *Bivens* to its precise circumstances – precisely the opposite of the law. *Cf. Watkins*, 144 F4th at 937 n.6 (rejecting "arguments come close to urging that *Carlson* be limited to its facts" because "[n]either the Supreme Court nor this court has tried to slice so finely the 'new context' inquiry in *Bivens* jurisprudence").

Nor is it relevant here that Defendants characterize themselves as "high-level" officials. Defs. Br. at 16. "While the 'rank of the officers involved' is one way in which a case 'might' differ from *Bivens*, it is hardly dispositive." *Xi v. Haugen*, 68 F.4th 824, 835 (3rd Cir. 2023). The defendants in *Carlson* included high-level officials, including the Director of the Bureau of Prisons. *See* 446 U.S. at 14. Official rank *can* be relevant to show that a plaintiff's *Bivens* claim challenges policy and

35

implicates a new context that way. In *Ziglar*, for example, the plaintiffs' "detention policy claims challenge[d] the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil." 582 U.S. at 140. And the claims against the high-level officials, including the Attorney General and the FBI Director, similarly would have "call[ed] into question the formulation and implementation of a general policy." *Ibid*. Much the same was true for the supervisory officials in *Henry v. Essex County*, 113 F.4th 355 (3rd Cir. 2024). They were sued for not training their subordinates in proper post-arrest procedures. *See id*. at 362 & n.5. But Patel is not sued for formulating policy or failing to train subordinates. He is sued for an unlawful warrantless arrest, exactly like the agents in *Bivens*. The *Bivens* new context inquiry involves a functional approach. *See Arias*, 150 F.4th at 35. And just as a prosecutor's title is irrelevant to immunity when she performs a non-advocacy function, *see Odd v. Malone*, 538 F.3d 202, 208 (3rd Cir. 2008), a high-ranking official's position is not dispositive when he performs a line-level function like making an arrest.

When applied to the false arrest claim, the Defendants' argument for meaningful differences in "the mechanism of injury" and the "kinds of proof those injuries would require" is just plain wrong. *See* Defs. Br. at 16. The Fourth Amendment false arrest claim here is in no such sense different from the arrest claim in *Bivens*. Similarly mistaken is the argument that "[t]his case takes place within the

36

context of a Congressional inspection of an immigration facility, rather than a narcotics arrest at a personal residence." *Ibid*. (citation omitted). The Fourth Amendment violation here occurred outside the Delaney Hall facility on public property after the Mayor complied with Patel's order to leave, while congressional representatives separately sought to inspect the detention center in keeping with their statutory rights. *See* Am. Compl. ¶¶ 24-26. Hence the Fourth Amendment violation here no more arose in the context of "a Congressional inspection of an immigration facility" than the violation in *Hicks* had anything to do with "an 'inter-agency squabble within the [E]xecutive [B]ranch.'" *Hicks*, 64 F.4th at 167. And as already explained, the Supreme Court has not limited Fourth Amendment *Bivens* claims to "narcotics arrest[s] at a personal residence" as Defendants imply. Defs. Br. at 16.[8]

---

[8] Defendants also imply that special factors "not considered in *Bivens* itself" make for a new context, without developing any argument explaining why. *See* Defs. Br. at 16; 17-18. In all events, the "special factors" arguments are misplaced as explained *infra*. Defendants also cite *Kalu v. Spaulding*, 113 F.3d 311, 327 (3rd Cir. 2024), as "holding that the presence of an alternative process and congressional action not previously considered meant that a case arose in a new context." Defs. Br. at 16. But *Kalu* did not hold that an "alternative process" by itself made for a new context. It identified other meaningful differences between the plaintiff's claim that prison officials did not protect him from sexual assault by a guard and the medical-care claims in *Carlson*. *See* 113 F.3d at 326. That's important because considering "alternate processes" at step one risks implying that *Bivens*, *Carlson*, and *Davis* are all overruled even though the Supreme Court itself has not done so expressly. *See Arias*, 150 F.4th at 41-42; *see also id*. at 46 ("[W]e cannot agree that any precedent of the [Supreme] Court holds that a previously unconsidered alternative remedy akin to the IGA's administrative mechanism for lodging complaints in and of itself suffices to render a context new."); *cf. Muniz v. United States*, 149 F.4th 256, 266-67 (3rd Cir. 2025) (Restrepo, J., concurring) (explaining that considering alternate

Accordingly, Mayor Baraka's false arrest claim arises in the established context of *Bivens*, and Defendants' motion for dismissal should be denied.

### C. The Fourth Amendment malicious prosecution claim does not arise in a new *Bivens* context.

Mayor Baraka has also stated a valid *Bivens* claim for Fourth Amendment malicious prosecution. The false arrest claim covers damages resulting from the Mayor's arrest and the resulting loss of liberty up to the time of his initial appearance, *see* Am. Compl. ¶ 45. The malicious prosecution claim covers damages thereafter up until the government dropped its bogus case on May 19, 2025. *See Wallace*, 549 U.S. at 389-90; *see also* Am. Compl. ¶¶ 45-51.[9] And just as the Mayor's Fourth Amendment false arrest claim does not present a new *Bivens* context, neither does his malicious prosecution claim. The malicious prosecution claim here involves only the additional damages that resulted when the government doubled down on the

---

processes only at *Ziglar's* step two "is a more accurate interpretation of *Egbert* than ours in *Kalu*"). See *infra* for discussion, should step two apply, of why the Supreme Court in *Bivens* was unmoved by the possibility of alternatives such as those advocated by Defendants, including the Hyde Act, criminal code, and administrative claims.

[9]     The common law distinguished between the torts of false imprisonment (of which false arrest is a subset) and malicious prosecution. False imprisonment (or arrest) covers detention without legal process and "ends once the victim becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389. Thereafter, unlawful detention forms part of the damages for malicious prosecution "which remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process." *Id*. at 390 (footnote omitted).

38

unconstitutional arrest by presenting him to a judicial officer and filed a criminal complaint, Am. Compl. ¶¶ 44-45. *See Gallo v. City of Philadelphia*, 161 F.3d 217, 225 (3d Cir. 1998). The plaintiff in *Bivens* was similarly presented to a judicial officer. *See Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics*, 409 F.2d 718, 719 (2d Cir. 1969), *rev'd*, 403 U.S. 388 (1971).

Defendants rely on cases much further afield from *Bivens* to argue for what they see as meaningful distinctions here. *See* Defs. Br. 15-18. The cases they rely on involved *Bivens*-differentiating factors that are not present here. *Xi v. Haugen*, 68 F.4th 824 (3rd Cir. 2023), involved a counter-intelligence and grand jury investigation that culminated in an indictment that triggered the plaintiff's arrest. *See id.* at 828-39; *see also* Fed. R. Crim. P. 9(a). Counterintelligence implicates the kinds of national security considerations that make for a context quite different from *Bivens*. *See Xi*, 68 F.4th at 834. And while misleading a grand jury to obtain an indictment, as in *Xi* and in *Farah v. Weyker*, 926 F.3d 492, 500 (8th Cir. 2019), may indeed be a different "mechanism of injury" as Defendants argue, Defs. Br. at 16, it is not the mechanism of injury here.

### D. "Special Factors" do not foreclose *Bivens* relief here.

Because this case "does not present a new *Bivens* context, the inquiry ends there, and a *Bivens* remedy is available." *Kalu v. Spaulding*, 113 F.3d 311, 326 (3rd Cir. 2024). Accordingly, no "special factors" analysis is appropriate. In any event,

Defendants' special factors arguments rely on distinguishable contexts, or they conflate the "new context" and "special factors" inquiries. None are persuasive (and certainly none alter the conclusion that the claims here arise in the established *Bivens* search and seizure context).

Pointing to 28 U.S.C. § 1495 and the Hyde Amendment,[10] Defendants argue that "remedies for those unjustly prosecuted or convicted" are special factors foreclosing Mayor Baraka's *Bivens* false arrest and false imprisonment claims. Defs. Br. at 17. That ignores the separate nature of false arrest and false imprisonment claims. *See Wallace*, 549 U.S. at 389-90. Neither section 1495 nor the Hyde Amendment addresses false arrest. And while a statutory remedy need not provide complete relief to foreclose *Bivens* damages, *see Schweicker v. Chilicky*, 487 U.S. 412, 423 (1988); *Bush v. Lucas*, 462 U.S. 367, 388 (1983), the plaintiff's basic injury at least must be "fully cognizable" by that remedy. *Bush*, 462 U.S. at 387; *see also id*. at 387 n.28 (observing that search and seizure claims would not be covered by the Civil Service Reform Act scheme at issue in *Bush*).

Defendants' argument relying on "the criminal process itself and the Federal Rules of Criminal Procedure," Defs. Br. at 17, is similarly flawed. A criminal

---

[10] *See* Departments of Commerce, Justice, State, and the Judiciary, and Related Agencies, Appropriations Act, 1998, Title VI, § 617, Pub. L. No. 105-119, 111 Stat. 2440, 2519 (1997).

defendant cannot object to his prosecution on the ground that he was brought before the court by a false arrest. *See Frisbie v. Collins*, 342 U.S. 519, 522-23 (1952). He can seek release from custody on the ground that probable cause to hold him is lacking, but the prospect of judicial release from custody did not foreclose damages relief in *Bivens* itself, and so it cannot do so here.[11] For similar reasons, the various administrative complaint procedures Defendants cite, Defs. Brief at 17-18, also do not operate as *Bivens*-preclusive special factors here. The Supreme Court in *Bivens* was unmoved by the possibility of such alternatives, *see Bivens*, 403 U.S. at 422 (Burger, CJ., dissenting), and as already explained, where *Bivens* applies its force as precedent forecloses dismissal based on such remedies. *See Arias*, 150 F.4th at 41.

The remainder of Defendants' arguments are little more than a grab-bag of inapplicable special factors plucked from *Ziglar* and other cases involving different contexts. That "Congress frequently legislates in the areas of immigration and immigration enforcement, but has not chosen to create a damages remedy," Defs. Br. at 19, is irrelevant. Patel was not enforcing immigration law, nor was Mayor Baraka subject to immigration jurisdiction. That also disposes of Defendants' related worry

---

[11]    The Hyde Amendment and 28 U.S.C. § 1495 present closer questions with respect to the malicious prosecution claim. *See Xi*, 64 F.4th at 837. But because Mayor Baraka's malicious prosecution claim, like his false arrest claim, does not present a new *Bivens* context (unlike the claim in *Xi*), the court need not address whether these statutory remedies are a special factor when a malicious prosecution is commenced by an initial appearance and a criminal complaint rather than grand jury presentation and indictment.

41

that "no court could predict the systemwide consequences of" allowing "the mayor of a major city" to sue for an illegal trespass arrest "during the course of a Congressional inspection." *Ibid*. Similarly, the asserted "risk of interference with the executive branch's investigative function," *id.* at 20 (cleaned up), or its "prosecutorial and immigration functions," *ibid.*, is no more a special factor here than in *Bivens* itself. *See Hicks*, 64 F.4th at 167. This case is also quite unlike *Henry*, in which a plaintiff who was mistakenly arrested under a valid warrant sued because federal marshals did not promptly investigate her claim of innocence. *See* 113 F.3d at 362. So, the government's worry over creating new incentives for its agents "to take claims of innocence seriously," Defs. Br. at 20 (cleaned up), is not implicated.[12]

3. **The Defendants are not entitled to Qualified Immunity for the *Bivens* claims, because there was no probable cause to initiate the arrest, and because they violated a clearly established constitutional right.**

---

[12]    For the same reason, *Henry* does not support Defendants' suggestion that this case involves a *Bivens* extension because the Mayor's Fourth Amendment claim would require him to credit the Mayor's statement that a guard permitted him to enter Delaney Hall. *See* Defs. Br. at 20. Defendants conflate the "new context" and "special factors" inquiries, and conflate both of those with the merits. Under what circumstances an officer contemplating an arrest must credit certain evidence, including a subject's explanation of his actions, is a bedrock question of Fourth Amendment arrest law that presents nothing new in the search and seizure context. *See Harvard v. Cesnalis*, 973 F.3d 190, 200 (3d Cir. 2020); *see also Pinkney v. Meadville, PA*, 95 F.4th 743, 749 (3d Cir. 2024). It has no bearing on the *Bivens* cause of action question because "the [Supreme] Court's latest cases are not a green light for [defendant's] effort to smuggle potential substantive defenses into the question whether the suit presents a new context." *Watkins*, 144 F.4th at 938 (cleaned up).

42

Defendants argue that even if *Bivens* applies, dismissal must be granted based on qualified immunity. However, qualified immunity does not shield Defendants from responsibility here. When assessing qualified immunity, the inquiry is two-fold: "(1) whether the plaintiff sufficiently alleged a right had been violated, and (2) whether the right was clearly established when it was allegedly violated to the extent that it would have been clear to a reasonable person that his conduct was unlawful." *Evans v. Newark City*, 152 F.4th 537, 544 (3d Cir. 2025). "The 'clearly established' test ensures that government officials are not liable unless they had reasonable notice that their conduct would be considered unlawful." *Id*. at 545.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' and that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, *supra*.

The Third Circuit has held that the rights to be free from arrest except on probable cause, and to be free from criminal prosecutions that lack probable cause, are clearly established. *Andrews v. Scuilli*, 853 F.3d 690, 705 (3d Cir. 2017); *Gallo v. City of Philadelphia*, 161 F.3d 217, 220 n.4 (3d Cir. 1998).

43

N.J.S.A. 2C:18-3(b) provides that a petty disorderly offense of defiant trespass is committed, if a person:

> Knowing that he is not licensed or privileged to do so, [ ] enters or remains in any place as to which notice against trespass is given by:
>
> (1) Actual communication to the actor; or
>
> (2) Posting in a manner prescribed by law or reasonably likely to come to the attention of intruders; or
>
> (3) Fencing or other enclosure manifestly designed to exclude intruders.

N.J.S.A. 2C:18-3(b). The code provides an affirmative defense if "the actor reasonably believed that the owner . . . or other person empowered to license access thereto, would have licensed him to enter or remain[.]" N.J.S.A. 2C:18-3(d)(3).

Here, Mayor Baraka was *invited* to enter inside the fence of Delaney Hall by a guard of GEO Group, the contractor that licenses and operates the facility. Am. Compl. ¶ 20. The Mayor calmly waited at the point of instruction for forty-five minutes. Am. Compl. ¶ 21. Upon arriving on the scene, Patel, who does not represent the owner of the property, instructed the Mayor to leave, at which point the Mayor advised him that he was invited onto the property. Am. Compl. ¶ 22. At that point, congressional representatives advised Patel that they wished for the Mayor to join them in the inspection. Am. Compl. ¶ 22. Patel threatened the Mayor with arrest, at which point the Mayor said: "I'm leaving now," and Patel responded "Okay, go." Am. Compl. ¶ 24.

44

The Mayor thus, did not "knowingly . . . enter[] or remain[]" on the property because he "reasonably believed that the owner . . . or other person empowered to license access" – i.e., the GEO security guard -- allowed him to enter and remain. Moreover, once Patel asked him to leave the property, the Mayor complied and exited the area. It was only after he exited, 5 minutes later and while on public property, that he was violently arrested. Am. Compl. ¶ 29-31. Specifically, 20 DHS agents, many armed and masked, descended on him and members of Congress, and Patel ordered the DHS agents to "take him down" (meaning violently tackle the Mayor of Newark). Am. Compl. ¶ 29-31.

The resulting Patel Affidavit falsely stated that "Ras Baraka, did, knowing that he was not licensed or privileged to do so, enter and remain in a place as to which notice against trespass was given." Am. Compl. ¶ 40. This is plainly false, as the Mayor was invited onto the property. The Affidavit further falsely details that the Mayor "unlawfully entered and remained in the Delaney Hall Facility." *Id.* This is plainly false, because Mayor Baraka was invited onto the property by an agent of the private company that owns the property, and was instructed by that agent to remain there for approximately forty-five minutes, which the Mayor did and complied, until he voluntarily and peacefully exited the private property upon request by Patel. *Id.*

45

In 2025, when the false arrest and malicious prosecution were effectuated, any reasonable officer would have known that by including false statements and omitting key evidence from a probable cause charge, a defendant's constitutional rights would be violated.

Defendants are "not free to disregard plainly exculpatory evidence." *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016). Patel *knew* that the Mayor was invited onto the property, because the Mayor told him, because agents and all who were present observed the invited entry, and simply because there was no way to get into the fenced-in, secured area absent permission. The Affidavit wholly omits how the Mayor gained entry. If Patel truly believed that the Mayor somehow broke into or snuck onto the property, he would have asserted facts to support that allegation. The Affidavit also wholly omits that the Mayor voluntarily left the premises upon request.

To demonstrate a lack of probable cause where, as here, an officer provided an affidavit to support the initiation of criminal prosecution, a plaintiff must show (1) that the officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 786-87 (1999), quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997) (quotation marks omitted). "An assertion is made with

46

reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Wilson,* 212 F.3d at 788, quoting *United States v. Clapp*, 46 F.3d 795, 801, n. 6 (8th Cr. 1995). And an assertion is material if, after excising the inaccuracies or inserting the recklessly omitted information, probable cause would not have been established. *Wilson*, 212 F.3d at 789. *Cf. Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959) (the knowing use of "false evidence, including false testimony, to obtain a tainted conviction" is implicitly violative of "any concept of ordered liberty.").

In addition to the falsities and omissions evident in the Affidavit, Habba's statements made in the midst of her media campaign to support the malicious prosecution are plainly false, including but not limited to her assertions that the Mayor "was put under arrest inside the facility," that he "willingly chose to disregard the law," that the Mayor "storm[e]d an ICE facility, [ ] putting detainees at risk, putting law enforcement at risk" and that "[The Mayor] broke into a detention facility." And so on. Am. Compl. ¶¶ 36-40. *See also* J. Espinosa transcript, *supra.*

The motion to dismiss based on qualified immunity should be denied because Mayor Baraka has asserted allegations which must be accepted as true and construed in the light most favorable to him, which plausibly allege a lack of probable cause to effectuate the arrest and prosecution.

47

### 4. Habba is not entitled to Absolute Immunity

Habba summarily claims, relying on *Imbler*, that she is entitled to absolute immunity for her decision to prosecute the Mayor. Defs. Br. at 25. She seeks to extend this absolute immunity to the Mayor's allegation that she orchestrated and initiated the criminal prosecution. However, absolute prosecutorial immunity is narrow, functional, and tied to the prosecutor's role as an advocate in the judicial process. While the Supreme Court in *Imbler* held that a prosecutor is immune from a civil damages suit for conduct in "initiating a prosecution and in presenting the State's case," the Court expressly left open whether a similar immunity applies when a prosecutor acts as an administrator or investigative officer rather than an advocate. *Imbler v. Pachtman*, 424 U.S. 409 (1974). The Third Circuit applies the same functional approach. A prosecutor seeking absolute immunity bears a "heavy burden," and the court begins with the presumption that qualified immunity, not absolute immunity, is sufficient. *Odd v. Malone*, 538 F.3d 202 (3d Cir. 2008).

The distinction between judicial or quasi-judicial acts and how the prosecution was manufactured, supported, prolonged, or procured is dispositive in malicious prosecution claims. Thus, a prosecutor's investigatory functions not related to preparation for prosecution or judicial proceedings are not entitled to absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993). *See also Fogle v. Sokol*, 957 F.3d 148 (3d Cir. 2020); *Roberts v. Lau*, 90 F.4th 618 (3d Cir. 2024). Here,

48

the Mayor alleges that Habba initiated the criminal prosecution without probable cause despite clear evidence. Am. Compl. ¶¶ 63-64. The complaint further alleges that she participated in the investigation and orchestrated the prosecution for political purposes, even before judicial process commenced. Am. Compl. ¶ 66. Given Habba's intimate involvement in the Mayor's arrest and prosecution – and her forewarning five weeks earlier that she would use her office to turn the state "red" and go after Democratic officials who supported immigrant rights – the scope of the availability of her defense of absolute immunity remains to be seen. It is an inherently factbound inquiry as to when she performed a strictly judicial function in her role as a federal prosecutor, which is inappropriate at the motion to dismiss phase.

## 5. The City of Newark

Notwithstanding that the City of Newark is not a party to this action, Defendants argue that the Mayor's suit, which is brought in both his personal and official capacity, is inappropriate insofar as it is brought in his official capacity. To substantiate its argument, Defendants summarily incorporate, without additional detail, their prior arguments regarding the FTCA claims and exhaustion of administrative remedies. Defs. Br. at 26. And Defendants summarily cite, with no explanation, to *Kentucky v. Graham*, 473 U.S. 159 (1985), in support of their proposition. However, *Graham* relates to Section 1983 suits brought *against* agents

49

in their personal or official capacities. Here, the Mayor's interest in this litigation is in connection to both the personal effect of his false arrest and malicious prosecution and in connection with his function as the Mayor of the City of Newark. In other words, he was not simply only present at Delaney Hall as an independent actor, but in connection with his role in protecting all residents in Newark, NJ, including those detained at Delaney Hall. While the City is not a named party to the action, the nexus of events and harms is directly connected to the Mayor's functional roles. As such, the complaint is properly pleaded as being brought on behalf of the Mayor in his personal and official capacity.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' motion to dismiss in its entirety.

Respectfully submitted,

/s/ Yael Bromberg
YAEL BROMBERG
BROMBERG LAW LLC

Plaintiff's Attorney

Dated: July 24, 2026