**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MAYOR RAS BARAKA, *in his official and personal capacities*,<br><br>Plaintiff,<br><br>v.<br><br>ALINA HABBA AND RICKY J. PATEL, *in their personal and official capacities*,<br><br>Defendants. | Case No. 2:25-cv-06846 (BRM) (JBC)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is a Motion to Dismiss ("Motion") (ECF No. 23) Plaintiff Ras Baraka's ("Baraka") Second Amended Complaint ("SAC") (ECF No. 22) filed by Defendants Alina Habba ("Habba") and Ricky J. Patel ("Patel") (together, "Defendants"). Baraka filed an Opposition (ECF No. 30), and Defendants filed a Reply (ECF No. 35). Additionally, Lawyers Defending American Democracy ("LDAD") filed an amicus curiae brief in support of Baraka and in opposition to Defendants' Motion. (ECF No. 26-1; *see also* ECF No. 27.) Having reviewed and considered the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78(b), for the reasons set forth below and for good cause having been shown, Defendants' Motion (ECF No. 23) is **GRANTED**.

## I. BACKGROUND

The Court accepts the factual allegations in the SAC as true and draws all inferences in the light most favorable to Baraka for purposes of Defendants' Motion.[1] *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory Sec. Litig.* (*In re Burlington*), 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

### A. Factual Background

Baraka is the mayor of Newark, New Jersey. (ECF No. 22 ¶ 2.) Habba was the "interim United States Attorney for the District of New Jersey" during the relevant period. (*Id.* ¶ 3; *see also United States v. Giraud*, 160 F.4th 390, 395, 406 (3d Cir. 2025) (taking no issue with the lawfulness of Habba's interim selection pursuant to 28 U.S.C. § 546, which ended on July 24, 2025).) Patel, at all relevant times, was the Special Agent in Charge of the Newark Division of Homeland Security Investigations ("HSI"), in the Department of Homeland Security ("DHS"). (ECF No. 22 ¶ 4.)

On May 9, 2025, three members of the United States House of Representatives, including Congresswoman LaMonica McIver, arrived at Delaney Hall, an Immigration and Customs Enforcement ("ICE") detention center in Newark, New Jersey, that is "own[ed] and operate[d]" by the GEO Group ("GEO"), for an inspection of the facility. (*Id.* ¶¶ 8, 14.) Congresswoman

[1] However, as to Defendants' factual attack on the Court's jurisdiction over Baraka's state law claims, the Court does not presume the truthfulness of Baraka's allegations. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016)) (explaining that there is no presumption of truthfulness as to a plaintiff's allegations when assessing a factual attack).

McIver invited Baraka to meet her and her colleagues for a post-inspection press conference outside Delaney Hall. (*Id.* ¶ 15.)

At 1:42 PM, Baraka arrived at Delaney Hall and spoke to members of the public. (*Id.* ¶ 18.) Eight minutes later, "the GEO . . . guard at the [Delaney Hall] gate invited . . . Baraka to enter inside the fence of Delaney Hall[,] stating that it would 'calm the crowd.'" (*Id.* ¶ 20.) "From 1:50 PM to 2:33 PM, Baraka calmly waited just a few feet inside the fence surrounding Delaney Hall." (*Id.* ¶ 21.) At 2:33 PM, Patel approached "Baraka and told him to leave the property owned . . . by . . . GEO . . . , even though an agent of GEO invited . . . Baraka onto the property." (*Id.* ¶ 22.)

Later, the members of Congress "expressed their desire [for Baraka] [to] . . . join them." (*Id.* ¶ 24.) After that, Patel "threatened to arrest" Baraka. (*Id.*) In response, Baraka informed Patel he was leaving to which Patel replied, "Okay, go." (*Id.*) Nonetheless, at "2:44 PM, five minutes after . . . Baraka left the GEO . . . property, approximately [twenty] DHS agents, many armed and masked, descended on . . . [Baraka] and [the] members of Congress without any attempt to calm fears or to ensure peace." (*Id.* ¶ 29.) Patel ordered the DHS agents to "take him down." (*Id.* ¶ 30.) The agents "pushed[] [and] shoved . . . [Baraka's] security team and [the] members of Congress before . . . pulling . . . [his] arms and arresting him." (*Id.*) According to Baraka, "Habba and Patel conspired[] with others[] to abuse their offices and effectuate the arrest premised upon a knowingly false [a]ffidavit stating that 'Ras Baraka, did, knowing that he was not licensed or privileged to do so, enter and remain in a place as to which notice against trespass was given[,]' . . . [despite having been] invited onto the property by an agent of the private company that owns the property." (*Id.* ¶ 40.)

"At 3:07 PM, DHS representatives left Delaney Hall by car with . . . Baraka and brought him to another DHS facility[,] where he was subjected to being photographed for a mug shot and

fingerprinted." (*Id.* ¶ 32.) "The DHS agents interviewed . . . Baraka for approximately . . . [half an hour,] during which [time] he explained that he was invited onto the GEO . . . property by a GEO . . . employee and that he left the property when ordered to do so." (*Id.* ¶ 33.)

At 3:05 PM, "before the [United States] Attorney had filed a complaint[]" and before Baraka had been photographed and fingerprinted, Habba issued the following statement on her "*personal*" social media account:

> The Mayor of Newark, Ras Baraka committed trespass and ignored multiple warnings from Homeland Security Investigations to remove himself from the Ice detention center in Newark, New Jersey this afternoon. He has willingly chosen to disregard the law. That will not stand in this state. He has been taken into custody. NO ONE IS ABOVE THE LAW.

(*Id.* ¶ 34 (emphasis in original).) Baraka maintains "Habba issued the . . . statement and authorized [his] . . . arrest . . . despite having knowledge of clear evidence that [he] . . . had not committed the petty offense of 'defiant trespass.'" (*Id.* ¶ 35.)

Later that same day, Habba "participated in a telephone interview with Fox News" during which she continued to make so-called false and defamatory statements including:

> (A) "[Baraka] refused to leave, was put under arrest inside the facility, walked out when he was told he was under arrest, and then was cuffed[;]"
>
> (B) "The Mayor was inside and told he would be under arrest inside when he refused to leave after several notifications that he should remove himself. He chose not to do so and then was placed under arrest when he walked out of the facility[;]" and
>
> (C) "It's called grandstanding, unfortunately. When you break the law, there's no grandstanding that will help you."

(*Id.* ¶ 36 (emphasis omitted).) According to Baraka, "[a]t the time . . . Habba published the above statements, she was aware that . . . Baraka had not committed trespass, had not refused to leave

the ICE detention center in Newark, did not ignore multiple warnings to leave the facility, and had not 'willingly chosen to disregard the law.'" (*Id.* ¶ 37.)

"Defendants kept . . . Baraka in federal custody for over five hours." (*Id.* ¶ 43.) According to Baraka, "[o]rdinarily, federal law enforcement officials issue a summons for the petty offense of trespassing." (*Id.*) Baraka maintains that "[u]sually, the alleged trespasser is not arrested or imprisoned for hours before his presentation before a judge." (*Id.*) But "DHS, under . . . Patel's direction, . . . increased . . . Baraka's time in custody by delaying the submission of a charging document to the court for nearly five hours." (*Id.* ¶ 44.) "Hours after his arrest, . . . on the evening of May 9, 2025, . . . Baraka had his initial appearance in federal court virtually from DHS headquarters, during which . . . Patel sat next to him." (*Id.* ¶ 45.)

Three days later, Baraka "was subjected to a pre-trial services interview," which he alleges "invaded his privacy with extremely intrusive and demeaning questions about his personal life and personal history." (*Id.* ¶ 46.) On May 15, 2025, Baraka attended a status conference before the Hon. André M. Espinosa, U.S.M.J. (*Id.* ¶ 47.) Habba also attended. (*Id.*) "[A]lthough . . . Baraka had already been photographed and fingerprinted by DHS, U.S. Marshals took . . . [him] to the basement of the federal courthouse," where he was photographed and fingerprinted again. (*Id.* ¶ 48.)

After video became public of the events of May 9, 2025, "Habba threatened . . . [Baraka] with [additional] . . . charges, claiming . . . she would charge him with resisting arrest if he did not agree to give up his right to sue for attorneys' fees." (*Id.* ¶ 49.) Baraka refused. (*Id.*) Ten days later, "Habba moved to dismiss the charge against him." (*Id.* ¶ 50.) Judge Espinosa granted the motion on May 21, 2025 (*id.* ¶ 51) and made the following remarks:

> The hasty arrest of . . . Mayor Ras Baraka, followed swiftly by the dismissal of these trespassing charges a mere [thirteen] days later,

> suggests a worrisome misstep by . . . [the U.S. Attorney's Office]. An arrest, particularly of a public figure, is not a preliminary investigative tool. It is a severe action, carrying significant reputational and personal consequences, and it should only be undertaken after a thorough, dispassionate evaluation of credible evidence . . . . The apparent rush in this case, culminating today in the embarrassing retraction of charges, suggests a failure to adequately investigate, to carefully gather facts, and to thoughtfully consider the implications of your actions before wielding your immense power. Your Office must operate with a higher standard than that.

Tr. of Mot. to Dismiss Hrg. at 11–12, *United States of America v. Baraka*, No. 25-cr-11131 (D.N.J. May 21, 2025), ECF No. 15 (emphasis omitted).

**B. Procedural History**

Baraka filed his Complaint against Habba and Patel in this matter on June 3, 2025.[2] (ECF No. 1.) Pursuant to the Court's judicial preferences, Defendants filed a pre-motion letter on September 9, 2025 (ECF No. 9), which Baraka responded to on October 14, 2025 (ECF No. 16).[3] On April 9, 2026, the Court held an in-person pre-motion conference.[4] (ECF No. 19.) At that conference, the Court granted Baraka's application for leave to file a second amended complaint

---

[2] According to Baraka, the Court has federal question jurisdiction based on the claims brought pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971) and supplemental jurisdiction over the defamation and false light claims. (*See* ECF No. 1 ¶ 5; *see also* ECF No. 22 ¶ 5.)

[3] On September 20, 2025, Baraka sought a twenty-one-day extension to file a response to Defendants' pre-motion letter because of a substitution of counsel (ECF No. 13), which the Court granted (ECF No. 15).

[4] While the pre-motion conference was originally scheduled for November 4, 2025, the conference was adjourned at Defendants' request due to (1) the recent lapse in federal appropriations, (2) this Court's Standing Order 2025-06 staying most civil matters involving the United States, including cases involving its officers or employees in their individual capacity, and (3) 31 U.S.C. § 1342, which bars federal employees from working during a government shutdown, except in limited circumstances not applicable here. (ECF No. 17.)

("SAC") (ECF No. 19),[5] which was memorialized in an order issued on April 13, 2026 (ECF No. 21).

On May 8, 2026, Baraka filed the SAC. (ECF No. 22.) Baraka's SAC includes four claims: False Arrest *Bivens* Claim (Count I); Malicious Prosecution *Bivens* Claim (Count II); Defamation (Count III); and False Light (Count IV). (*Id.* ¶¶ 52–81.) The *Bivens* claims are brought against Habba and Patel in both their individual and personal capacities, while the defamation and false light claims are brought against only Habba in her individual capacity. (*Id.*) Defendants filed a motion to dismiss for lack of jurisdiction and failure to state a claim on June 9, 2026.[6] (ECF No. 23.) Baraka filed an Opposition on July 25, 2026.[7] (ECF No. 30.) Defendants filed a Reply on August 14, 2026.[8] (ECF No. 35.)

---

[5] Baraka raised spoliation concerns at the April 9, 2026 pre-motion conference. (ECF No. 19.) The Court explained Baraka could formally raise the issue in a letter to the Court. (*Id.*) Baraka did not file such a letter, so the Court presumes that issue is now moot.

[6] On June 18, 2026, LDAD filed a notice of appearance and requested the Court's permission to file a motion for leave to file an amicus curiae brief in support of Baraka and in opposition to Defendants' motion to dismiss. (ECF No. 24.) According to LDAD, Baraka and Defendants consented to the motion. (ECF No. 24-1 at 1.) Four days later, the Court ordered LDAD to file its motion for leave to file an amicus curiae brief along with its proposed amicus curiae brief by June 29, 2026. (ECF No. 25.) LDAD did so on June 25, 2026. (ECF No. 26.) The Hon. Leda D. Wettre, U.S.M.J., granted LDAD's motion for leave to file the proposed amicus curiae brief on June 16, 2026. (ECF No. 27.)

[7] With Defendants' consent, Baraka sought a two-week extension for the opposition brief (ECF No. 28), which the Court granted (ECF No. 29).

[8] With Baraka's consent, Defendants sought a nine-day extension to file a reply in support of their motion to dismiss (ECF No. 31), which the Court granted (ECF No. 32). Additionally, with Baraka's consent and the Court's permission (ECF No. 34), Defendants filed an overlength reply (ECF No. 35).

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *Dickerson v. Bank of Am., N.A.*, Civ. A. No. 12-3922, 2013 WL 1163483, at *1 (D.N.J. Mar. 19, 2013) (quoting *In re Corestates Tr. Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993)). A motion to dismiss under Rule 12(b)(1) challenging the Court's subject matter jurisdiction asserts the Court lacks "authority or competence to hear and decide the case before it." *Northlight Harbor, LLC v. United States*, 561 F. Supp. 2d 517, 520 (D.N.J. 2008) (citing Charles Alan Wright & Arthur R. Miller, *5B Federal Practice and Procedure* § 1350 (3d ed. 2004)). "The party asserting jurisdiction bears the burden of demonstrating in the record that jurisdiction is proper." *Id.* at 521; *see also Wright v. N.J./Dep't of Educ.*, 115 F. Supp. 3d 490, 495 (D.N.J. 2015) ("It is well-settled that the plaintiff bears the burden of establishing subject matter jurisdiction . . . to defeat a motion under Rule 12(b)(1)."). In considering dismissal for lack of subject matter jurisdiction, a district court's focus is not on whether the factual allegations entitle a plaintiff to relief, but rather on whether the court has jurisdiction to hear the claim and grant relief. *See Maertin v. Armstrong World Indus., Inc.*, 241 F. Supp. 2d 434, 445 (D.N.J. 2002) (citing *New Hope Books, Inc. v. Farmer*, 82 F. Supp. 2d 321, 324 (D.N.J. 2000)). The court is tasked with determining "whether [it is] dealing with a facial or factual attack to jurisdiction." *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 514 (3d Cir. 2007).

A facial attack "is an argument that considers a claim on its face and asserts that it is insufficient to invoke the subject matter jurisdiction of the court because, for example," (1) "it does

not present a question of federal law," (2) "there is no indication of a diversity of citizenship among the parties," or (3) "some other jurisdictional defect is present." *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). The standard of review for a facial attack is the same as one "under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party." *Id.* (citing *In re Schering Plough Corp. Intron*, 678 F.3d 235, 243 (3d Cir. 2012)).

A factual attack, however, "concerns not an alleged pleading deficiency, but rather the actual failure of [a plaintiff's] claims to comport with . . . jurisdictional prerequisites." *United States ex rel. FLFMC, LLC*, 855 F. Supp. 2d 300, 304 (D.N.J. 2012) (quoting *Atkinson*, 473 F.3d at 514). Unlike a facial attack, no presumption of truthfulness attaches to a plaintiff's allegations. *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016)).

The Third Circuit has "repeatedly cautioned against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits." *Davis*, 824 F.3d at 348. "[D]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Id.* at 350 (alteration in original) (quoting *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 899 (3d Cir. 1987)).

Here, Defendants have mounted a facial and factual attack on the SAC as their Rule 12(b)(1) argument is based both on Baraka's failure to plead and actually exhaust his administrative remedies. *See Burdge v. United States*, Civ. A. No. 22-549, 2022 WL 17095375, at *1 (M.D. Pa. Nov. 21, 2022). In assessing the factual attack, the Court may "consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elecs. Inc. v. United*

*States*, 220 F.3d 169, 178 (3d Cir. 2000) (citing *Mortensen v. First Fed. Sav. and Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

**B. Rule 12(b)(6)**

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957); and then quoting Fed. R. Civ. P. 8(a)(2)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than

an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancement" and not just conclusory statements or a "recitation of the elements of a cause of action." *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, allowing "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 570). The Supreme Court's ruling in *Iqbal* emphasizes a plaintiff must show the allegations of his or her complaints are plausible. *See id.* at 670.

While, generally, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or*

*explicitly relied* upon in the complaint." *In re Burlington*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

## III. DECISION

### A. Defamation/False Light (Against Habba in Her Individual Capacity)

Habba moves the Court to dismiss both the defamation (Count III) and false light (Count IV) claims because the Court lacks jurisdiction over both claims. First, Habba argues these claims are actually claims against the United States rather than her and, therefore, the Federal Tort Claims Act ("FTCA") governs the claims. She notes that a "Director of the Civil Division's Tort Branch certified Habba acted within the scope of her employment as Interim United States Attorney when she made statements about [Baraka's] arrest and prosecution." (ECF No. 23-1 at 9 (citing ECF No. 23-2 at 2).) The effect of that certification (known as a "*Westfall* Certification"),[9] according to Habba, is that the defamation and false light claims are converted into FTCA claims against the United States, not Habba. (*Id.* (citing 28 U.S.C § 2679(b)(1)).) Second, Habba contends dismissal of the defamation and false light claims for lack of subject matter jurisdiction is appropriate for two reasons: (1) Baraka has failed to plead exhaustion,[10] and (2) the United States, as the

---

[9] *See* 28 U.S.C. § 2679(d)(1) ("Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.").

[10] Indeed, as discussed *infra*, Habba also asserts Baraka has not actually exhausted his administrative remedies. (ECF No. 23-1 at 6, 10–11.)

substituted defendant, has retained sovereign immunity from defamation and false light claims.[11] (*Id.* at 9–13.)

Baraka focuses his opposition on the Court's ability to decide whether the United States may actually substitute in for Habba. (ECF No. 30 at 8–25.) More specifically, Baraka argues Habba's publication of the allegedly defamatory statements was beyond the scope of her employment. (*Id.* at 10–25.)

The Court begins by determining the applicability of the FTCA. The FTCA is an express, but limited, waiver of the sovereign immunity for certain actions brought against the United States. *See Miller v. Phila. Geriatric Ctr.*, 463 F.3d 266, 270 (3d Cir. 2006). "The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies." *McNeil v. United States*, 508 U.S. 106, 113 (1993). "The plaintiff bears the burden of proving exhaustion of administrative remedies." *Mendez Vallejo v. United States*, Civ. A. No. 20-12664, 2021 WL 2155380, at *3 (D.N.J. May 27, 2021) (citing *Medina v. City of Phila.*, 219 F. App'x 169, 171–72 (3d Cir. 2007)). "Failure to exhaust administrative remedies warrants dismissal for lack of subject matter jurisdiction." *Id.* (citing *McNeil*, 508 U.S. at 113). In 1988, Congress passed the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "*Westfall* Act"), which made the FTCA the exclusive remedy for suits against the United States that are based on negligent or wrongful acts by federal employees committed within the scope of employment. *See Lomando v. United States*, 667 F.3d 363, 375 (3d Cir. 2011). Under the *Westfall* Act,

> [u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the

[11] Habba suggests a false light claim is essentially a defamation claim. (ECF No. 23-1 at 12–13.)

> United States shall be substituted as the party defendant.

28 U.S.C. § 2679 (d)(1).

"Where a [p]laintiff . . . challenges the propriety of the United States's substitution as a [d]efendant in an FTCA case, the scope of employment certification filed by the Government . . . is '*prima facie* evidence' that [the employee's] conduct 'occurred within the scope of [her] employment.'" *Arostegui v. Plotzker*, Civ. A. No. 13–06528, 2014 WL 346543, at *2 (D.N.J. Jan. 29, 2014) (citing *Schrob v. Catterson*, 967 F.2d 929, 936 (3d Cir. 1992)). It falls on the plaintiff to come forward with specific facts rebutting the *Westfall* Certification. *See Schrob*, 967 F.2d at 936.

Habba is correct. For the reasons set forth below, the FTCA governs Baraka's defamation and false light claims because Habba was acting within the scope of her employment when she allegedly defamed Baraka. *See infra* Section III.A.1. Additionally, (1) because Baraka has failed to exhaust his administrative remedies, and (2) because the FTCA retains the United States's immunity against claims arising from intentional torts like defamation and false light, Habba's defamation and false light claims, which are converted to FTCA claims, must be dismissed. *See infra* Section III.A.2 (explaining Baraka has not met the FTCA's exhaustion requirement and that the FTCA does not waive sovereign immunity as to Baraka's defamation and false light claims).

**1. Habba made the allegedly defamatory statements within the scope of her employment, and therefore, substitution is appropriate.**

As noted above, the "Director of the Civil Division's tort Branch certified Habba acted within the scope of her employment as Interim United States Attorney when she made statements about [Baraka's] arrest and prosecution." (ECF No. 23-1 at 9 (citing ECF No. 23-2 at 2).) Although that certification is not dispositive, it is, as Defendants argue, "*prima facie* evidence that [Habba's] challenged conduct was within the scope of employment." *Giordano v. Hohns*, 159 F.4th 179, 185 (3d Cir. 2025) (quoting *Schrob*, 967 F.2d at 935). In response, Baraka points to various allegations

in the SAC to challenge the *Westfall* Certification. (ECF No. 30 at 14–22.) Nonetheless, for the reasons set forth below, the Court finds Habba was acting within the scope of her employment, and therefore substitution by the United States is appropriate, because: (1) making public statements regarding an alleged crime is the kind of conduct an interim United States Attorney is employed to perform, (2) Habba was motivated "at least in part, by a purpose to serve" her employer when she made the allegedly defamatory statement, and (3) the extent of the defamatory statements were not so outrageous as to bring that action outside the scope of employment. *See Di Cosala v. Kay*, 450 A.2d 508, 513 (N.J. 1982); *see also Schrob*, 967 F.2d at 935–36 (recognizing a court can rule on *Westfall* certifications without conducting discovery or a hearing and may resolve the scope of employment issue as a matter of law).

Under New Jersey law,[12] "[c]onduct is generally considered to be within the scope of employment if[] 'it is of the kind [that the servant] is employed to perform; it occurs substantially within the authorized time and space limits; [and] it is actuated, at least in part, by a purpose to serve the master.'" *Di Cosala*, 450 A.2d at 169 (second and third alterations in original) (quoting Restatement (Second) of Agency § 228 (1957)). The Court's analysis begins with the first element before turning to the third and then concluding with the second. *See infra* Sections III.1.a–c. For the reasons set forth below, all three elements are satisfied.

**a. The conduct at issue was of the kind Habba was employed to perform.**

Habba was, at all relevant times, the interim United States Attorney for the District of New

[12] To answer whether substitution is appropriate here, the Court turns to New Jersey law, which answers the question in the affirmative. *See Vanderklok v. United States*, 868 F.3d 189, 203 (3d Cir. 2017) ("In determining whether an employee was acting within or outside of the scope of [her] duties, [courts] look to the law of the state in which the action took place.").

Jersey—the head federal prosecutor in New Jersey.[13] *Giraud*, 160 F.4th at 395, 406. As such, Habba was permitted to "engag[e] in public communications on social media to promote [the DOJ's] work and further valid community engagement objectives." U.S. Dep't of Just., *Justice Manual 1-9.000-Personal Use of Social Media* (Apr. 2025), https://perma.cc/HB3K-MAT4. Habba's comments—though ultimately unfounded, as evidenced by the United States of America's proposed order for dismissal of the charges brought against Baraka—were related to an impending criminal charge. *See* Tr. of Mot. to Dismiss at 11–12, *United States of America v. Baraka*, No. 25-11131 (D.N.J. May 21, 2025), Dkt. No. 15. In other words, her conduct was of the kind an interim United States Attorney would be employed to perform. *See Donio v. United States*, 746 F. Supp. 500, 506 (D.N.J. 1990) (explaining making press "statements are authorized as part of a prosecutor's regular responsibilities in administering the law"); *see also Landham v. Taylor*, 68 F. App'x 608, 610 (6th Cir. 2003) (concluding an Assistant United States Attorney "was acting within the scope of his employment when he gave [an] interview to [a] newspaper reporter").

In *Donio v. United States*, the court applied New Jersey's *respondeat superior* law and found the then-Assistant United States Attorney acted within the scope of employment because it was within the scope of a prosecutor's office to issue press statements. 746 F. Supp. 500, 506

---

[13] Ordinally, part of the Court's task would be to determine whether the individual defendant, here, Habba, was an "'[e]mployee of the government' as defined by the FTCA." *Giordano*, 159 F.4th at 186 (quoting 28 U.S.C. § 2671). But Baraka has only attacked Defendants' contention that Habba was acting within the scope of her employment. *See Hilburn v. Dep't of Corr.*, Civ. A. No. 07-6064, 2010 WL 703202, at *11 (D.N.J. Feb. 23, 2010) ("Typically, an argument not raised in an opening brief is waived." (citing *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994))). For purposes of completeness, the Court finds an interim United States Attorney is an employee of the government because 28 U.S.C. § 2671 treats "officers or employees of any federal agency" as "[e]mployee[s] of the government" and includes the "executive departments" in its definition of a "federal agency." 28 U.S.C. § 2671. Accordingly, based on the plain text of the statute, as the interim United States Attorney for the District of New Jersey, Habba was an employee of the government as contemplated by the FTCA during the relevant period.

(D.N.J. 1990). That reasoning applies here, particularly because Habba was not merely a line prosecutor in the United States Attorney's Office for the District of New Jersey but rather the head of that office. Therefore, the first scope of employment element is satisfied because the underlying conduct—communicating with the public regarding crime in the interim United State Attorney's jurisdiction—is of the kind a federal prosecutor is employed to perform.

**b. The allegations in the SAC do not suggest that Habba was not motivated to serve her employer when she made the statements at issue.**

As to the service element, Baraka argues it would be premature to resolve the question of whether Habba was acting within the scope of her employment because discovery is needed to determine whether she was at all motivated by "a purpose to serve the American people in the pursuit of justice, or whether" she was solely motivated by "some other private, personal, or partisan purpose." (ECF No. 30 at 14.) Baraka relies chiefly on the following three assertions: (1) Habba used her personal social media account to publish the statements at issue, (2) there were only five weeks between the publication of the statements at issue and the partisan statements Habba made on the day she was installed, and (3) the publication of the statements at issue were outrageous, in part, because of the "clear evidence" of Baraka's innocence. (*Id.* at 14–22.)

Here, discovery is not needed to resolve the scope of employment question, *i.e.*, whether to accept the *Westfall* Certification. *Schrob*, 967 F.2d at 935–36; *see also Donio*, 746 F. Supp. at 506 (explaining on a motion to dismiss that "[s]o long as the employee is not motivated by purely personal reasons, his or her acts may be within the scope of employment, though 'quite improper,' or 'imbecilic'" (first quoting *Di Cosala*, 450 A.2d at 513; and then quoting *Gibson v. Kennedy*, 128 A.2d 480, 485 (N.J. 1957))).

First, Habba's use of her personal social media account to publish the allegedly defamatory statements is not evidence she was completely unmotivated to serve her employer. *See Lindke v.*

*Freed*, 601 U.S. 187, 197 (2024) (explaining many public officials "use social media for personal communication, official communication, or both—and the line between the two is often blurred"). Even assuming Habba sometimes used her personal social media account to publish some content wholly unrelated to her role as interim United States Attorney, as Defendants correctly observe, "the substance" of the statements at issue "arose from, related to, and furthered the work" of the United State Attorney's Office for the District of New Jersey. (ECF No. 35 at 5.) Habba's office brought charges against Baraka. *See* Tr. of Mot. to Dismiss at 11–12, *United States of America v. Baraka*, No. 25-11131 (D.N.J. May 21, 2025), Dkt. No. 15. In other words, the statements—though posted on her personal social media account—were related to her work as the then-interim United States Attorney for the District of New Jersey. The essential point, then, is not the fact that Habba used her personal account to post about Baraka's arrest and her office's decision to bring charges against him but rather the substance of Habba's statements. *See, e.g.*, *Lindke*, 601 U.S. at 203 (explaining a mayor might invoke "state authority" by posting an order on "his Facebook page"). For example, in *Bobulinski v. Goldman*, the court, guided by the District of Columbia's interpretation of the Restatement (Second) of Agency,[14] considered it "not dispositive that some of the posts" at issue came from the congressman's "personal account rather than his official account" because "[a]ll the statements were related to" "issues that were newsworthy and taking place before the legislative body" he served. Civ. A. No. 24-974, 2025 WL 1707696, at *3–4 (D.D.C. June 18, 2025). So too here. Habba took to her personal social media account not to post about Baraka generally, but to comment on his arrest and prosecution, which was being handled by her office. (ECF No. 22 ¶¶ 34–36.) Put simply, the allegation that Habba used her personal

[14] Like the District of Columbia, New Jersey also follows the Restatement (Second) of Agency in defining what conduct "is generally considered to be within the scope of employment." *Di Cosala*, 450 A.2d at 169.

social media account to publish the statements at issue does not suggest she acted solely for her own purpose in commenting on Baraka's arrest and prosecution.

Second, Baraka relies on partisan-colored remarks Habba made during the five-week period leading up to his arrest. (ECF No. 30 at 16.) Specifically, he cites to Habba's statements about "turn[ing] New Jersey red" and potentially "investigating" Democratic state officials who interfere with federal immigration operations to argue Habba was not motivated to serve her employer when she defamed Baraka. (*Id.* (quoting ECF No. 22 ¶¶ 12–13).) Baraka essentially posits Habba could not have published the defamatory statements with any purpose of serving her employer if she held partisan motivations. (ECF No. 30 at 8 ("Habba was working outside of the scope of federal employment because she was motivated by a personal, political agenda rather than the fair administration of justice.").) But that argument ignores that "New Jersey has adopted [the] dual purpose exception, which provides [a] basis for employer liability when [an] employee is furthering [an] employer's business as well as his or her private interests." *Carter v. Reynolds*, 815 A.2d 460, 467 (N.J. 2003) (citing *Gilborges v. Wallace*, 396 A.2d 338, 342 (N.J. 1978)). Given that issuing public statements about prosecutions were part of Habba's responsibilities as an interim United States Attorney, the Court is not persuaded the SAC supports the inference that Habba was not at least motivated in part to serve her employer. Simply stated, the facts read in the light most favorable to Baraka suggest Habba had a dual purpose when she issued the statements at issue. Under New Jersey law, that is not enough. *See, e.g.*, *Gilborges*, 396 A.2d at 342 ("[W]here the trip serves the servant's private affairs and also is in furtherance of the master's business, the master is subject to liability for the servant's actions.").

Third, the supposed outrageousness of the statements at issue does not suggest Habba was not motivated to serve her employer when she purportedly defamed Baraka. Baraka has listed a

litany of facts that are, candidly, concerning. (ECF No. 22 ¶ 37 (alleging Habba accused Baraka of trespassing despite knowing the falsity of that statement).) Indeed, "it is surely true that an innocent person may suffer great harm to his reputation and property by being erroneously accused of a crime." *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 184 (3d Cir. 2006), *as amended* (May 16, 2006) (quoting *Deaver v. Seymour*, 822 F.2d 66, 69 (D.C. Cir. 1987)). But, at best, Baraka has put forth conclusory allegations of actual malice, *see N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (Brennan, J.), which does not necessarily mean that Habba was acting outside the scope of her employment.[15] Baraka essentially contends that knowingly lodging a false allegation of trespass could not serve the interests of the United States. (ECF No. 30 at 25 (arguing Baraka has pleaded facts . . . [that] reasonably demonstrate the conduct performed was outside the scope of federal employment").) If Baraka's "framing were correct, and [he] could defeat a *Westfall* certification simply by asserting that defamatory statements do not serve the government's interests, it would be difficult to see when a defendant in such a defamation action would ever be within the scope of employment." *Bobulinski*, 2025 WL 1707696, at *4. But the Third Circuit has recently upheld a *Westfall* certification in a defamation case. *See Giordano*, 159 F.4th at 200–01. Put another way, although a federal prosecutor is certainly not employed to defame criminal defendants, if a federal prosecutor like Habba does so while publicly speaking on criminal activity within her jurisdiction, that is not outrageous for purposes of the scope of employment analysis.

Further, in support of his argument that Habba's actions were too outrageous to have been motivated by a purpose to serve her employer, Baraka points to a declaration from Emmanuel Miranda ("Miranda"), the Director of the Department of Public Safety for the City of Newark (the

---

[15] Because the Court does not reach the merits of Baraka's libel claim, the Court does not conclusively hold Baraka has sufficiently alleged actual malice.

"Miranda Declaration"). (ECF No. 30 at 17–18 (citing ECF No. 30-1 ¶¶ 13–16, 19, 23–27, 31, 36–37, 39).) The Miranda Declaration, according to Baraka, is evidence Habba acted beyond the scope of her employment because the statements commented on a supposedly jurisdictionally defective criminal charge. (*Id.* at 20–21.) According to Miranda, federal agents lack jurisdiction outside of Delaney Hall to charge state-level offenses. (ECF No. 30-1 ¶ 24.)

Here, Baraka was arrested and prosecuted for criminal trespass, a state-level offense. *See* Compl. at 2, *United States of America v. Baraka*, No. 25-cr-11131 (D.N.J. May 9, 2025), Dkt. No. 1. To facilitate this arrest and prosecution, the United States of America relied on the Assimilative Crimes Act, 18 U.S.C. § 13, which, as the name of the law suggests, assimilates state law crimes as federal law when a defendant commits "non-federal crimes" on a federal enclave acquired pursuant to 18 U.S.C. § 7. *See* Compl. at 3, *United States of America v. Baraka*, No. 25-cr-11131 (D.N.J. May 9, 2025), Dkt. No. 1 ("The Delaney Hall facility currently operates as a federal immigration facility pursuant to a contract between the GEO Group, Inc., the entity that owns the Delaney Hall Facility, and U.S. Immigration and Customs Enforcement" and "[a]s a result of this contract, the Delaney Hall Facility has been acquired for the use of the United States and is under the jurisdiction of the United States."). According to Baraka, however, he "was arrested on public, state property." (ECF No. 30 at 21 (citing ECF No. 22 ¶ 22).) In short, Baraka argues Habba's allegedly defamatory statements were outrageous because the arrest and subsequent prosecution were without federal criminal jurisdiction. (*Id.* at 30–31.)

Relying on Comment C to the Restatement (Second) of Agency § 235, Baraka's theory is as follows: Because there were questions as to the authority for the arrest and prosecution of Baraka, Habba's unnecessary rush to make defamatory statements shows that she made those statements for "a non-governmental purpose." (*Id.* at 29, 31.) The Court disagrees. At most, this

merely suggests Habba defamed Baraka with actual malice because she recklessly disregarded the possibility that the arrest and subsequent prosecution were defective and would ultimately be dismissed. *See Sullivan*, 376 U.S. at 280. That is not tantamount to an outrageous act, *i.e.*, conduct not done with the intention of "perform[ing] the employer's business." Restatement (Second) of Agency § 235 cmt. c (1958).

Baraka asks the Court to look to the illustration associated with Comment C to the Restatement (Second) of Agency § 235 to better understand what constitutes an outrageous act. (ECF No. 30 at 22.) While that illustration is indeed instructive, it demonstrates Habba did not act outrageously. All parties agree on what the illustration describes. An individual was "employed to eject trespassers." Restatement (Second) of Agency § 235 cmt. c, illus. 4 (1958). A four-year-old boy sought "to enter the premises." *Id.* Although the individual "could easily [have] prevent[ed] the child from so doing by calling to him[ ]. . . , he [shot] . . . the child and kill[ed] him." *Id.* This is a far cry from how Habba handled the supposed trespass. Habba did not attempt to shoot Baraka like the individual in the illustration; instead—for purposes of the *Westfall* certification—she made public statements (though perhaps defamatory) about the events that led to the arrest and prosecution of Baraka. (*See* ECF No. 22 ¶¶ 34, 36, 39.) In sum, neither the supposed outrageousness of the defamatory statements, Habba's use of her personal social media account, nor the possibility that Habba was partially motivated by partisan motives suggest Habba was not motivated to serve her employer when she made the allegedly defamatory statements.

**c. As an interim United States Attorney, Habba made the allegedly defamatory statements within working hours and the spatial boundaries of her employment.**

Baraka argues Habba did not make the statements within the "time and space limits" authorized by her employment. (ECF No. 30 at 22 (citing Restatement (Second) of Agency § 228

(1)(b)).) In making this argument, Baraka relies almost exclusively on his contention "Habba has not yet provided any proof" Baraka was arrested on a federal enclave. (*Id.*) Baraka misunderstands the "time and space" requirement, particularly given the type of employment Habba held.

First, Baraka mistakenly focuses on where he was arrested. The conduct at issue is not the arrest, but rather the making of the allegedly defamatory statements. Habba made these statements on social media and while participating in a telephone interview broadcasted on television. (ECF No. 22 ¶¶ 34, 36.)

As in *Donio*, making a public statement about potential criminal activity within a prosecutor's jurisdiction falls within the ambit of a prosecutor's employment. 746 F. Supp. at 502, 506. There, while not expressly opining on the "time and space" element of the scope of employment analysis, the court explained making "a statement to a reporter for the Philadelphia Inquirer concerning the nature of the charge" fell within the scope of the assistant United States Attorney's employment. *Id.* While the context is somewhat different here, that is only because times have changed. *See Packingham v. North Carolina*, 582 U.S. 98, 99 (2017) (explaining social media is "the modern public square"). Since *Donio* was decided, the means by which government officials communicate to the public have evolved greatly. *See Bobulinski*, 2025 WL 1707696, at *2 ("[E]ngagement with the public often occurs on social media."). In sum, Habba's use of social media and her participation in media interviews to address criminal activity in New Jersey falls within the spatial limits of her employment as the interim United States Attorney for District of New Jersey.

Second, with respect to the temporal element, Baraka seems to argue the "'outrageous' nature of the conduct [is] indicia" that Habba issued the defamatory statements outside the "proper time." (ECF No. 30 at 22.) In arguing that Habba acted beyond the time limits of her employment,

Baraka points to the fact that Habba commented about Baraka's arrest and the conduct that led to his arrest before Baraka was even charged. (ECF No. 22 ¶ 34 (emphasizing Habba posted on social media about Baraka's arrest before "the [United States] Attorney had filed a complaint, and before [Baraka] had been fingerprinted and photographed").) That argument presumes an interim United States Attorney's job starts only at the formal charging stage. *Cf. United States v. Abreu*, 747 F. Supp. 493, 505 (N.D. Ind. 1990), *aff'd sub nom. United States v. Vasquez*, 966 F.2d 254 (7th Cir. 1992) ("[T]he acting United States [A]ttorney is the chief executive officer in charge of law enforcement for [her] district . . . ."). As the interim United States Attorney, it was within Habba's discretion to bring charges against Baraka. *See Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). As such, her commentary on the conduct underlying those charges—while made before the charges were formally brought by her office—were within the temporal limits of her employment.[16]

In sum, Baraka has failed to rebut the *Westfall* Certification because he has failed to show that Habba acted outside the scope of her employment. Therefore, substitution by the United States is appropriate. Because the United States can take Habba's place as the defendant for purposes of the defamation and false light claims, Defendants are correct—the FTCA will govern these claims. *Osborn v. Haley*, 549 U.S. 225, 229–30 (2007).

---

[16] Moreover, United States Attorneys (interim or otherwise) lead offices tasked with addressing criminal activity that occur at any given time within their respective jurisdictions. *See Giraud*, 160 F.4th at 393 ("The United States Attorneys' offices are some of the most critical agencies in the Federal Government. They play an important role in the criminal and civil justice systems and are vital in keeping our communities safe."). Because crime is not confined to some arbitrary temporal limitation, it follows then that commentary in response to crimes from leaders of United States Attorneys' offices are not arbitrarily confined to some "9-to-5" limitation. But even setting that aside, Habba's statements on social media were published at "3:05 PM" during normal working hours. (ECF No. 22 ¶ 34.) Indeed, Baraka does not argue otherwise (ECF No. 30 at 22), nor does he argue the defamatory statements made on television occurred beyond the time limits of Habba's employment. (*Id.*)

**2. The defamation and false light claims fail because Baraka has failed to plead exhaustion (or actually exhaust his administrative remedies) as required by the FTCA, and even so, both claims are barred by the FTCA.**

The application of the FTCA is fatal for Baraka because "an FTCA plaintiff must exhaust all administrative remedies before suing in federal court, and exhaustion 'is jurisdictional and cannot be waived.'" *Doe v. United States*, 842 F. App'x 719, 722 n.3 (3d Cir. 2021) (quoting *Shelton v. Bledsoe*, 775 F.3d 554, 569 (3d Cir. 2015)).

Baraka—perhaps assuming the FTCA was inapplicable—has failed to plead exhaustion.[17] (*See* ECF No. 22 at 1–18.) Therefore, the defamation and false light claims must be dismissed for lack of subject matter jurisdiction. While the Court need not opine on additional grounds for dismissal, the Court also finds that sovereign immunity provides an additional jurisdictional rationale for dismissal of the defamation and false light claims. As Defendants correctly note, defamation claims are categorically barred by the FTCA because they arise from false statements and must be dismissed. *Brumfield v. Sanders*, 232 F.3d 376, 382 (3d Cir. 2000) (dismissing defamation claim and finding it barred by 28 U.S.C. § 2680). Moreover, the "intentional tort of false light invasion of privacy arises out of libel and slander and cannot support liability against the Government." *Bohnenkamp v. Whisterbarth*, Civ. A. No. 19-115, 2021 WL 1600477, at *7 (W.D. Pa. Apr. 23, 2021). Accordingly, sovereign immunity provides an independent jurisdictional ground for dismissal of the defamation and false light claims.

---

[17] Beyond simply failing to plead exhaustion, Baraka has not, in fact, exhausted his administrative remedies. Here, Baraka did not file an administrative tort claim with the Department of Justice until after he commenced suit. (*Compare* ECF No. 1, *with* ECF No. 23-3 at 3.) That is also fatal because it is axiomatic that plaintiffs cannot exhaust their administrative remedies after filing their complaint. *See McNeil v. United States,* 508 U.S. 106, 110–13 (1993).

**B. *Bivens* Claims (Against Habba and Patel)**[18]

Defendants argue the Court should not imply a *Bivens* remedy for Baraka's Fourth Amendment malicious prosecution (Count I) and false arrest (Count II) claims for two reasons: Baraka's constitutional claims "present a new *Bivens* context" and special factors "bar an extension of *Bivens* here." (ECF No. 23-1 at 13, 15, 16.)

Baraka contends neither his false arrest claim, nor his malicious prosecution claim, is an extension of *Bivens*. (ECF No. 30 at 33, 38.) According to Baraka, Defendants improperly focus on immaterial factual differences. (*Id.* at 33, 39.) Additionally, Baraka maintains Defendants' "special factors arguments rely on distinguishable contexts, or they conflate the 'new context' and 'special factors' inquiries." (*Id.* at 40.) For the reasons reviewed in greater depth below, the Court agrees with Defendants—this case presents a new *Bivens* context and special factors counsel against extending a *Bivens* remedy to the claims asserted by Baraka against Defendants. *See infra* Section III.B.1–2.

In *Bivens*, the Supreme Court recognized at least some circumstances in which federal

[18] Baraka adds *Bivens* claims against Habba and Patel in both their "personal" and "official capacities." (ECF No. 22 at 13.) In bringing suit against them in their official capacities, under Supreme Court precedent, Baraka has brought suit against the entity of which Habba and Patel are agents. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. NY. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)); (*see* ECF No. 22 ¶¶ 2–3 (alleging in the SAC that Habba and Patel were agents of the federal agencies for which they worked during the relevant period)). Therefore, the *Bivens* claim is construed as being brought against the federal agency, and the *Bivens* claims against Habba and Patel in their "official capacities" are dismissed.

However, the claims against the federal agency still fail. The Supreme Court has categorically barred any such *Bivens* claims against federal agencies. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994) ("An extension of *Bivens* to agencies of the Federal Government is not supported by the logic of *Bivens* itself."); *Albert v. Yost*, 431 F. App'x 76, 81 (3d Cir. 2011) ("A *Bivens* claim can be maintained only against individual federal officers, not against a federal entity."). Therefore, the Court only considers the claims against Habba and Patel in their individual capacity.

courts can fashion a judge-made damages remedy for constitutional violations by federal officers. 403 U.S. at 390–97. However, since *Bivens* was decided, the Supreme Court has made abundantly clear "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (quoting *Iqbal*, 556 U.S. at 678).

Against this backdrop, the Supreme Court established a two-step framework to determine whether a *Bivens* context is novel, which requires a court to first consider whether a plaintiff's claim presents a context in which the Supreme Court had not previously recognized a *Bivens* claim and, if so, whether special factors counsel against extending *Bivens* to permit such a claim. *Graber v. Dales*, Civ. A. No. 18-3168, 2019 WL 4805241, at *3 (E.D. Pa. Sept. 30, 2019) (citing *Ziglar*, 582 U.S. 135–37). However, under Third Circuit law, "the two-step framework established in *Ziglar* largely reduces to just one question: 'whether there is *any* reason to think that Congress *might* be better equipped to create a damages remedy.'" *Fisher v. Hollingsworth*, 115 F.4th 197, 205 (3d Cir. 2024) (emphasis added in *Fisher*) (quoting *Egbert v. Boule*, 596 U.S. 482, 492 (2022)).

Pursuant to *Ziglar*, before considering whether there are special factors that weigh against extending *Bivens* here, *see infra* Section III.B.2, the Court first considers whether Baraka's *Bivens* claims present a new context, *see infra* Section III.B.1.

**1. Because Baraka brings claims against new categories of defendants, this case is meaningfully different from *Bivens*.**

"A case presents a new *Bivens* context if it is 'different in a meaningful way from previous *Bivens* cases decided by th[e] [Supreme] Court.'" *Barry v. Anderson*, Civ. A. No. 22-3098, 2023 WL 8449246, at *3 (3d Cir. Dec. 6, 2023) (alteration in *Barry*) (quoting *Ziglar*, 582 U.S. at 139).[19]

---

[19] Plaintiffs are, of course, right that *Barry v. Anderson* is a "nonprecedential" opinion from the Third Circuit, meaning it is not formally binding on the Court. (ECF No. 30 at 34.) Still, a "nonprecedential [Third Circuit] opinion may nonetheless be persuasive." *Sovereign Bank v. B.J.'s Wholesale Club, Inc.*, 427 F. Supp. 2d 526, 536 (M.D. Pa. 2006). The reasoning in *Barry* is

As the Third Circuit has explained, "[t]his 'threshold test' is 'easily satisfied.'" *Id.* (quoting *Xi v. Haugen*, 68 F.4th 824, 834 (3d Cir. 2023)). Applying guiding Third Circuit precedent, this case presents a new context from *Bivens*, which "alone require[s] dismissal."[20] *Fisher*, 115 F.4th at 205 (alteration in *Fisher*) (quoting *Egbert*, 596 U.S. at 493). "The Supreme Court has provided examples of meaningful differences; as relevant here, these include a 'new category of defendants' . . . ." *Barry*, 2023 WL 8449246, at *3 (quoting *Ziglar*, 582 U.S. at 135, 139–40).

Here, Habba was the interim United States Attorney for the District of New Jersey and Patel was a HSI Special Agent in Charge. (ECF No. 22 ¶¶ 3–4.) These are "new categor[ies] of defendants." *Barry*, 2023 WL 8449246, at *3 (quoting *Ziglar*, 582 U.S. at 135) (observing that the federal official in *Bivens* was a federal narcotics officer). *Barry* teaches that this is enough to present a new context. *Id.*

Baraka, however, disagrees. (ECF No. 30 at 34–35.) Offering a narrower reading of *Barry*, Baraka argues Barry's case only presented a new context because the defendant was an ICE agent "enforcing immigration law." (*Id.* at 34.) Baraka misunderstands the Third Circuit's teaching. In *Barry*, the Third Circuit explained Barry's case "arises in a new *Bivens*" context because Barry's

---

persuasive because it faithfully adheres to the Supreme Court's teachings in *Ziglar* and *Egbert*. *See Graber v. Boresky*, Civ. A. No. 18-3168, 2025 WL 2433859, at *5 (E.D. Pa. Aug. 22, 2025) ("Since *Egbert*, the Third Circuit has held that law enforcement officers from federal agencies outside those enforcing narcotics laws are a 'new category' from *Bivens*." (citing *Barry*, 2023 WL 8449246, at *3)).

[20] There are "only three cases in which the Supreme Court has recognized a constitutional damages action against federal officials." *Fisher v. Hollingsworth*, 115 F.4th 197, 207 (3d Cir. 2024). Of these three cases, the only one that involved a violation of the Fourth Amendment was *Bivens* itself. *Id.* at 203 (describing *Davis v. Passman*, 442 U.S. 228, 229–34 (1979), as a "Fifth Amendment damages action against a Congressman who fired a staffer because she was a woman" and *Carlson v. Green*, 446 U.S. 14, 16–18, 16 n.1 (1980), as an "Eighth Amendment damages action against federal prison officials who failed to provide medical care to an asthmatic prisoner"). Accordingly, to assess whether this case presents a new *Bivens* context, the Court focuses solely on the facts in *Bivens*.

case was "against an ICE agent (a new category of defendant) enforcing immigration law (a new statutory mandate)." *Barry*, 2023 WL 8449246, at *3. In other words, the Third Circuit concluded Barry's case presented a new *Bivens* context on two independent bases.[21] *Id.* at *2 ("[E]xamples of meaningful differences; *as relevant here*, . . . include a 'new category of defendants' *and* 'the statutory or other legal mandate under which the officer was operating.'" (emphasis added) (quoting *Ziglar*, 582 U.S. at 135, 139–40)). As discussed, both the Supreme Court and the Third Circuit have made clear the involvement of a new category defendants is a meaningful difference from *Bivens*, *id.* at *2, which, by itself, "require[s] dismissal," *Fisher*, 115 F.4th at 205 (alteration in *Fisher*) (quoting *Egbert*, 596 U.S. at 493).

There are undoubtedly concerning similarities between the factual allegations underlying the false arrest claim here and in *Bivens*, namely the allegation that Baraka was arrested without probable cause. (ECF No. 22 ¶¶ 55, 63.) But as the Supreme Court has instructed, "even 'almost

[21] The court in *Barry* found the Fourth Circuit's *Tun-Cos v. Perrotte* decision instructive. *See Barry*, 2023 WL 8449246, at *2 (citing *Tun-Cos v. Perrotte*, 922 F.3d 514 (4th Cir. 2019)). The Third Circuit described *Tun-Cos* in the following manner: "The court concluded that the plaintiffs' action arose in a new *Bivens* context because unlike the federal narcotics officers enforcing criminal law in *Bivens*, the federal officers were ICE agents operating under immigration law." *Id.* (citing *Tun-Cos*, 922 F.3d at 524). Again, the Third Circuit has read *Tun-Cos* to mean that meaningful differences arise not only from the type of law the federal officer was enforcing but also the category of the defendant. See *Barry*, 2023 WL 8449246, at *3. Nonetheless, Baraka points to Fourth Circuit cases post-*Tun-Cos* to underscore that "the defendant's employing agency and job responsibilities are not in themselves dispositive." (ECF No. 30 at 35 (citing *Hicks v. Ferreyra*, 64 F.4th 156 (4th Cir. 2023) (holding that a plaintiff had a valid *Bivens* claim against U.S. Park Police officers). In *Hicks*, the Fourth Circuit did not expressly consider the fact that the case involved a different category of defendants but instead focused on the fact that Hicks "filed suit 'to hold accountable only line-level investigative officers, not high-ranking officials.'" 64 F.4th at 167 (quoting *Annappareddy v. Pascale*, 996 F.3d 120, 133 (4th Cir. 2021). Baraka embraces this approach. (ECF No. 30 at 30, 35.) But the rank of an officer is just one dimension of what constitutes a different category of defendants—as in *Barry*, the Third Circuit, the circuit in which this Court sits, also considers the defendant's employing agency as a separate dimension. 2023 WL 8449246, at *3 (highlighting the defendant was a "new category of defendant" because he was an ICE agent).

parallel circumstances' are insufficient 'to support the judicial creation of a cause of action'" when, as here, there are meaningful differences because of the involvement of a new category of defendants. *Barry*, 2023 WL 8449246, at *3 (quoting *Egbert*, 596 U.S. at 493); *see also Ziglar*, 582 U.S. at 135 (explaining that "extend[ing] *Bivens* to . . . [a] *new category of defendants*" would be "expanding" *Bivens*); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) ("Since *Carlson* we have consistently refused to extend *Bivens* liability to any new context or new category of defendants."). Simply put, this case is not "indistinguishable from *Bivens*." *Fisher*, 115 F.4th at 205. Therefore, the Court turns next to the second step of the *Ziglar* two-step framework, *i.e.*, whether special factors counsel against extending a *Bivens* remedy to this new context. *Egbert*, 596 U.S. at 496.

**2. The availability of an alternative remedy weighs against extending *Bivens* here.**

It is apparent that at least one special factor exists. *Id.* Here, that factor is the availability of an alternative remedy. *Barry*, 2023 WL 8449246, at *3–4 (declining to reach other potential factors counsel against extending a *Bivens* remedy where an alternative remedial scheme exists). As Defendants correctly points out, "Congress has created alternative remedial safeguards for those unjustly prosecuted or convicted for offenses against the United States." (ECF No. 9 at 3.) Specifically, the Hyde Amendment "allows courts to award attorney's fees and litigation costs to a prevailing criminal defendant 'when the court finds that the position of the United States was vexatious, frivolous, or in bad faith.'" *Xi*, 68 F.4th at 837. Additionally, 28 U.S.C. § 1495 "permits an award of damages to 'any person unjustly convicted of an offense against the United States and imprisoned.'" *Id.* (quoting 28 U.S.C. § 1495).

Critically, it is immaterial that a *Bivens* plaintiff is not completely satisfied with an alternative remedial scheme. *Id.*; *see also Patton v. Stamper*, Civ. A No. 24-0166, 2025 WL

1506308, at *2 (W.D. Pa. May 27, 2025) (adopting a Report and Recommendation that recommended dismissal of both the plaintiff's false arrest and false imprisonment claims because the Hyde Amendment provided an alternative remedial scheme), *appeal dismissed*, No. 25-2459, 2025 WL 4670465 (3d Cir. Sept. 16, 2025).[22] The Supreme Court has taught that an alternative remedy need not provide "complete relief" or be as "effective as an individual damages remedy" to foreclose *Bivens* relief. *Egbert v. Boule*, 596 U.S. 482, 493, 498 (2022) (quotation marks and citations omitted).

Like Xi, Baraka may not be satisfied, for instance, because he cannot actually avail himself of 28 U.S.C. § 1495, which permits an award of damages to "any person unjustly convicted of an offense against the United States and imprisoned." This is because, like Xi, Baraka "was never convicted and can only be made whole by monetary damages." *Xi*, 68 F.4th at 837. But, as the Third Circuit has explained, "the focus is not on an individual's [ultimate] recovery" but rather

[22] Baraka argues "[n]either [S]ection 1495 nor the Hyde Amendment addresses false arrest" so they are not alternative remedial schemes that foreclose Baraka's *Bivens* false arrest claim. (ECF No. 30 at 40.) Indeed, Baraka maintains "while a statutory remedy need not provide complete relief to foreclose *Bivens* damages, the plaintiff's basic injury at least must be fully cognizable by that remedy." (*Id.* (internal citations and quotation marks omitted).) Baraka relies on two pre-*Egbert* cases to make this argument. (*Id.* (first citing *Schweicker v. Chilicky*, 487 U.S. 412, 423 (1988); and then citing *Bush v. Lucas*, 462 U.S. 367, 388 (1983)).) Baraka's argument fails to persuade because it is essentially an argument 28 U.S.C. § 1495 and the Hyde Amendment are inadequate remedial schemes. As the Third Circuit explained in *Xi*, which involved claims that arose from the government's "arrest[] and later-dismissed indictment," "Congress created such a remedial process," including 28 U.S.C. § 1495 and the Hyde Amendment "for the kinds of claims brought by Xi and found sufficient deterrence in providing a remedy to one class of plaintiff—*i.e.*, convicted defendants—and not to another—*i.e.*, those whose indictments were dismissed." 68 F.4th at 837. Unlike a falsely *convicted* defendant, Baraka has no remedy, but that does not mean Congress has not created an "alternative remedy." *Id.* In its wisdom, Congress decided these remedial schemes were enough to deter officers and prosecutors. *Id.*; *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) ("The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations."). That is sufficient for purposes of foreclosing an extension of *Bivens*. *Ziglar*, 582 U.S. 135 (explaining "expanding the *Bivens* remedy is now a 'disfavored' judicial activity" (quoting *Iqbal*, 556 U.S. at 675)).

"deterrence." *Id.* Courts "must respect its decision when 'Congress or the Executive has created a remedial process it finds sufficient to secure an adequate level of deterrence.'" *Id.* (quoting *Egbert*, 596 U.S. at 498). Said differently, "the absence of relief does not by any means necessarily imply courts should award money damages" since courts "defer to congressional inaction if the design of a [g]overnment program suggests Congress has provided what it considers adequate remedial mechanisms." *Egbert*, 596 U.S. at 501. As such, the Court declines Baraka's invitation to "second-guess that calibration by superimposing a *Bivens* remedy." *Id.*

## IV. CONCLUSION

For the reasons set forth above, and for good cause having been shown, Defendants' Motion (ECF No. 23) is **GRANTED**.[23] Counts I–IV are **DISMISSED WITHOUT PREJUDICE**.[24] Baraka may file a third amended complaint within twenty-one (21) days.[25] An appropriate order follows.

---

[23] Because Baraka brings suit in both his individual and official capacity, as Defendants point out, he "purports to add the City of Newark" or his office "as a plaintiff in this action." (ECF No. 23-1 at 25 (first quoting ECF No. 22 at 1; and then citing *Graham*, 473 U.S. at 165).) First, as to the defamation and false light claims, the City of Newark would have to allege that it exhausted its administrative remedies against the United States—it has not. (*See generally* ECF No. 22 (failing to allege exhaustion)); *see also Sac v. Fed. Commc'ns Comm'n*, Civ. A. No. 24-7294, 2025 WL 3003525, at *2 (D.N.J. Oct. 27, 2025) (explaining a failure to plead exhaustion required the court to dismiss the plaintiff's FTCA claim). Additionally, *Bivens* has never been extended to any claims brought by a local municipality, and the Court will not do so for the first time here. *Fisher*, 115 F.4th at 205.

[24] The Court need not opine on Defendants' remaining immunity arguments because it dismisses all of Baraka's claims. *See, e.g., Zalazar v. Kaminski*, Civ. A. No. 14-8132, 2016 WL 5403089, at *5 n.6 (D.N.J. Sept. 26, 2016).

[25] While the Court has reservations regarding Baraka's ability to allege facts that would survive a motion to dismiss, Baraka may file a third amended complaint because it is not clear that an amendment would be futile at this stage. *See Wilson v. RoundPoint Mortg. Servicing Corp.*, Civ. A. No. 21-19072, 2022 WL 3913318, at *4 (D.N.J. Aug. 31, 2022) (dismissing without prejudice having found amendment may not be "futile").

Date: September 4, 2026

/s/ *Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**